## CLEMENTS *v.* MOORE.
## MOORE *v.* CLEMENTS.

1. An objection to an amended bill in chancery because not filed with the leave of the court below (as it is contemplated by Rule 45 of the equity rules that such bills should be), or the objection that a replication is not in a sufficient form, under Rule 66 of the same rules, cannot be first made in this court. The objection if not made below is waived.

2. A paper put in after the answer filed and after part of the testimony has been taken, stating that the "plaintiffs in the cause hereby join issue with the defendants (naming them), and will hear the cause on bill, answer and proofs against the defendants," is a sufficient replication.

3. A purchaser of a stock of goods from a debtor confessedly insolvent, where the purchaser knows that the debtor's purpose is to hinder and delay a particular creditor, and also that if the debtor intended a fraud on his creditors generally, the purchase would necessarily be giving him facilities in that direction, is not responsible in equity (the sale being an open one, for a fair price, and followed by change of possession) for any part of the consideration-money which the debtor had applied to payment of his debts; but is responsible for any part which he has diverted from such payment.

4. Statements either oral or written made by the vendor after such a sale, are incompetent evidence against the purchaser on a suit by the particular creditor to set the sale aside.

5. A complainant in chancery cannot, by waiving a verification on oath to the defendant's answer, deprive such answer, when made with such verification, of its ordinary effect.

6. In chancery, when an answer which is put in issue admits a fact and insists on a distinct fact by way of avoidance, the fact admitted is established, but the fact insisted upon must be proved, otherwise the admission stands as if the fact set up in avoidance had not been averred.

7. Where a creditor shows facts that raise a strong presumption of fraud in a conveyance made by his debtor, the history of which is necessarily known to the debtor only, the burden of proof lies on him to explain it; his estate being insolvent.

8. In this case, three answers in chancery denying allegations made in a bill, of fraud on creditors by an admitted conveyance of real property on the part of an insolvent debtor to his wife through a third person, *held* not to disprove the allegations; the answers being discrepant in striking particulars from each other, and, as respected the consideration, with the deeds themselves; no proof being given of the mode of payment by the third person (who, it was set up, had purchased the property from the husband for himself, and afterwards sold it to the wife on payment from her separate property), nor any proof beyond the answers of her husband and herself and a previous statement of the

husband, then arranging the transaction, that the wife ever had any separate property.

9. In this case the court states the different modes in which law and equity respectively deal with fraudulent conveyances.

THESE were cross-appeals in equity from the District Court for the Western District of Texas.

Clements and Sheldon, judgment creditors of James Nicholson, filed in that court their original and amended bill (the last apparently without leave of court, as required by Rule 45*) against Nicholson, his wife, and a certain Moore, to set aside on the ground of fraud—

1. A sale by Nicholson of his entire stock of merchandise (dry goods); and

2. A conveyance by him to Moore, and by Moore to Mrs. Nicholson, of certain lots in Bastrop, Texas.

The bill charged that in November, 1852, the defendants obtained judgment against Nicholson for a debt contracted in March, 1851; that on the 5th July, 1851, Nicholson, having then on hand a large stock of goods, worth $12,000, but being in failing circumstances, sold them to Moore for $7000, this sum being paid only in notes of Moore, due at different times; that Moore knew Nicholson's condition; that the sale was collusive, and meant to defraud Nicholson's creditors;—a secret arrangement having existed between the parties to share any profits that Moore might make on a sale of the goods.

*As to the real estate*, the charge was, that at the same time with this pretended sale Nicholson had transferred to Moore five lots in Bastrop; to wit, three lots known in the plan of the town as Nos. 62, 65, and 70; and also two others, to wit, No. 95 and fractional lot No. 4, both east of Main Street; that this transfer was without consideration or with a nominal one only; and that the lots were now claimed by Mrs.

---

* This rule—one of the rules prescribed for courts of equity of the United States—says: "If any matter alleged in the answer shall make it necessary for the plaintiff to amend his bill, he may have *leave* to amend the same with or without the payment of costs, *as the court or a judge thereof may in his discretion direct.*"

Nicholson,—a redemption or repurchase by her being fraudulently set up with a view of furthering the plan of Moore and Nicholson to defraud the creditors of the latter.

Each defendant filed an answer.

NICHOLSON, admitting the debt charged, denied every allegation of collusion or fraud.

*As to the goods,* he averred that the allegation of an understanding that he and Moore were to share profits on a sale of the goods transferred, was "absolutely untrue and false:" and in answer to special interrogatories, stated that the goods cost in New York $8556; that they were sold to Moore at 20 per cent. discount on that cost,—the sale amounting thus to $6310, which he declared was their full worth.

*As to the lots,* that the sale of these had nothing whatever to do with the sale of the merchandise; that Moore purchased them in good faith, paying therefor the sum of *eight* hundred and sixty dollars; that subsequently to this sale it was agreed that they might be repurchased at the same price at which they were sold, with interest; that they were accordingly repurchased by his wife, Rebecca Nicholson; that the intervention of his wife was not for the purpose of defrauding the complainants or the other creditors. On the contrary, that it was for the purpose of securing the separate property of his wife, so purchased in good faith by her from Moore with her own means. The answer alleged that when he married the said Rebecca, "she was a widow, having a considerable amount of separate means and money, belonging to herself and to her child by a former husband; that from time to time she lent him these means to aid in carrying on his business, until the amount exceeded $500; that after the sale of said goods this defendant, in payment of said borrowed money, transferred *one* of Moore's notes for $500 to her; and that with it *and other* of her separate means, she purchased the lots from Moore;" that in fact, the lots had been purchased for the father of the defendant; and that the only reason why the defendant did not take the deed in his father's name was because he was an alien; that his father had ever since that time occupied them as a homestead, under a

arrangement with the defendant's wife that she should repurchase the property from Moore, and permit her father-in-law, now old, to occupy it during his lifetime; that the arrangement between Moore and the defendant's wife was not a mortgage, but a purchase in good faith; that his wife, having paid Moore, had, in the spring of 1853, filed a bill in the District Court of Bastrop County, to force him to reconvey the lots to her; and that the court had decreed a reconveyance, except as to No. 4, and also one lot, No. 95, "which was redeemed and sold to pay a debt due from defendant;" that Moore was ready to convey; and that in this arrangement some creditors who had levied upon the property concurred.

MOORE, admitting that it might be true that Nicholson was in failing circumstances (though of their extent he, Moore, knew nothing), denied all knowledge of the debt to the complainants.

*As to the goods,* he admitted the purchase at the price stated by Nicholson, for which price he alleged that he had given notes, which he had since paid; that the purchase was made by him in good faith, reluctantly on his part, and only after Nicholson had offered his goods to others, without their purchasing; that the goods at New York invoice prices amounted to $7887.75; that they were originally invoiced at high rates, and, being a broken and culled stock, were not worth New York cost in Bastrop. He denied all collusion with Nicholson, and all partnership in profits; and alleged that the profits which he made, if any, on the goods were so inconsiderable as not to be worth naming.

*As to the lots,* that on the 12th June, 1851, anterior, therefore, to the purchase of the goods, he, Moore, purchased them for *eight* hundred and sixty dollars, which he *paid* in good faith; that it was agreed with Nicholson "that the lots might be repurchased for the same sum, with interest at ten per cent."

The answer of Moore made the same statement as to the decree in the District Court of Bastrop as was contained in the answer of Nicholson; adding, that in the matter of the decree "this defendant had not intended collusion with any

one;" that the lots were "not redeemed but repurchased by Mrs. Nicholson;" though whether out of her own funds the respondent did not know, except as he was assured by Nicholson that they were so purchased.

MRS. NICHOLSON'S answer (which the complainants offered to receive without oath, but to which nevertheless she swore), was confined to the lots; the matter which was the subject of the bills so far as respected her. Denying all fraud, her answer stated that when she married Nicholson, she had in ready money the sum of about $1000, her own separate property; that her husband informed her that he was much pressed for some ready money, and agreed with her to give her in pledge two promissory notes of Moore, not then due, for about $500 each, for the use of this money; that she did give to her said husband the use of her said money, and took in lieu thereof the notes. She did not remember distinctly when she made the arrangement, but thought that it was some time during the year 1849 or 1850, and "that it was some time afterwards that she surrendered to the said Moore the said notes in discharge of a mortgage, which said Nicholson had before that time executed to him on the lots."

*A part of the testimony having been taken*, the complainants filed a paper thus:

"The plaintiffs in this cause hereby join issue with the defendants [naming them all], and will hear the cause, on bill, answer, and proofs, against the defendants."

The sixty-sixth rule of practice prescribed by this court for courts of equity of the United States, orders that—

"Whenever the answer of the defendant shall not be excepted to, &c., the plaintiff shall file the general replication thereto on or before, &c. [The rule makes the cause then at issue.] If the plaintiff shall omit or refuse to file such replication within the prescribed period, the defendant shall be entitled to an order, as of course, for the dismissal of the suit."

THE FACTS, so far as proved by testimony, seemed to be thus: Nicholson was a trader at Bastrop, and in the spring

and summer of 1851 was, in fact, embarrassed, and gener-ally reputed so to be in his affairs.

*As to the goods.* After the sale of the merchandise, it appeared—on the one hand—that a short time previously to the sale of them—one House then pressing him through Mr. Larkins, an attorney in Bastrop, for payment of a debt due *him*, and the attorney and Nicholson entering, somewhat confidentially, into consideration of the latter's affairs—Nicholson stated that he could pay House's claim, but that doing so would leave him so much embarrassed that he was afraid that a certain New York firm, which was named (and which was, in fact, the complainants in this suit), would " come down on him and appropriate his effects to the exclusion of a large amount of home and other debts, which he thought ought to be preferred under the circumstances." The debt of House having, through the efforts of Mr. Larkins, been satisfied, that person suggested to him the propriety of making to some one an assignment, by which provision could be made for any creditors whom he might wish to favor; and suggested the name of Moore as "a suitable man to close up the business." While Nicholson and Larkins were thus conversing, Moore happened to pass along in the street, and they, seeing him through the window, called him in. Nicholson then proposed to him to accept an assignment such as above mentioned. Moore said that he would take the matter under advisement; and the next day Larkins was desired to draw up such an assignment as had been contemplated. Becoming indisposed, however, the drawing of the deed was deferred. On getting to his office again, several days after the original conversation, Moore called to tell him, that he had decided not to take an assignment, but had purchased the goods absolutely.

As to what passed between Nicholson and Moore at the immediate time of the sale itself, little was shown by proofs, except that it was made on the 7th July, 1851; Moore, who had been confidentially asked to take the assignment, knowing, of course, that Nicholson was insolvent, and probably being informed, as well, of the motive of the assignment,

viz., to protect the "home creditors" against Clements and Sheldon. It was shown, however, that Moore took immediate possession of the store where the goods were and proceeded to retail them; that they were not worth more than he gave for them, and that after a fair sale, time and expenses being considered, he had lost rather than made money. It appeared also that all the notes which he had given as the consideration of the sale, had been applied by Nicholson to the payment of his *un*questioned debts, with the exception of three; one of $500, which he sold for $375 cash; and two of the same sum, each, which it was alleged that he had handed over to his wife under circumstances hereafter mentioned.

On the other hand, as respected the sale of the goods, it was testified by one Hall, that some time after it, Nicholson wanting money, offered to sell one of the notes, given on account of it (the note for $500 just spoken of), to him; that he, Hall, went to Moore to see if the validity of the note without offset was acknowledged; taking at the same time an open letter from Nicholson to Moore, requesting him to execute a new note to the purchaser of the old one. That the note being admitted, Hall did execute a new one. That after doing so he said, referring to the letter: "I will keep this letter, for I don't know what might happen. Jemmy Nicholson is a little rascally, and it is well enough to have it to show. But somebody would have made something out of the transaction, and I don't know why it should not be me as well as anybody else."

So also it was testified that on a friend's remarking to Nicholson that he had made an imprudent sale, and that he could have turned the goods over to his creditors at cost and charges, Nicholson replied, that "if Moore realized a good profit, he, Nicholson, was to have a portion." In addition, two original papers of Nicholson were produced, one a document, thus:

### MEMORANDUM.

"At the time of my difficulties, I was informed that I might be closed up by any one holding a small foreign claim, the

goods sold at a sacrifice to liquidate it, and nothing left for other creditors. Sick, and partly crazy with study, I knew not how to act, but threw myself on friends for advice; was advised to sell my stock and make an assignment; that M—— would be a good person to sell to; spoke to him, he was willing; but said that I should sell them for something less than cost; offered them at New York prices, which would be ten per cent. less than actual cost here; he said he would consider of it; afterwards came and said I ought sell them for less. I then considered myself; he then told me he had been speaking to some of my friends, and they advised me to let them go at 30 per cent. below N. Y. cost, and that I had better do it, and *if he made anything he would share it with me, or perhaps he first said he would give me something handsome, but afterwards said he would share it.* During last court week, he told me he was going to make something out of the goods; that he would share it with me, as it was always his intention."

The other paper was a letter, dated July 18th, 1853, accompanying this document, to the attorney of the complainant, in which he stated that Moore had said that if he would sell at 30 per cent. below New York cost, "*he would share with me the profits, as it was necessary for every man to protect himself and family.*"

*As to the lots.* No testimony was given beyond the fact that they were conveyed by Nicholson and wife, June 13th, 1851, that is to say, twenty-one days previously to the sale of the merchandise; that the deeds themselves, as given in the printed record, stated the consideration to have been *five* hundred and fifty dollars (not *eight* hundred and fifty, as stated in the answers of Nicholson and Moore); that at the time they were conveyed, Moore stated in Nicholson's presence to one Dunbar, the magistrate before whom the acknowledgment was taken, that they were all conveyed in consideration of a *debt* which Nicholson owed him, asking the magistrate to take notice of the facts; and that the District Court of Bastrop County, on a bill filed by Nicholson and wife against one Scott, Moore, and others (in order, apparently, t> prevent Scott, an execution creditor, from sell-

ing the lots), had, *by a decree entered by agreement of attorney,* enjoined a sale of those; and ordered "that Moore should make a complete title to Mrs. Nicholson for lots Nos. 62, 65, and 70, in accordance with his agreement," and that the undivided fractional half of No. 4 should be sold by the sheriff to satisfy the claim of Scott against Nicholson. About the remaining lot No. 95, the decree said nothing.

For the rest, the matter, as respected these lots, rested on the pleadings, in which the answers of Nicholson and wife, it will be remembered, stated that they were repurchased with separate money of Mrs. Nicholson, owned by her before her marriage with Nicholson; and that lot No. 95 had been resold to *him* and applied by him to pay one of his debts.

The court below dismissed the bill as to Mrs. Nicholson, and set aside the sale of the goods, as intended to defraud creditors, and therefore void.

The creditors appealed from this dismissal, and Moore from the other part of the decree.

*Messrs. G. W. Paschall, Senior and Junior, for Moore:*

1. The amended bill was filed without leave asked, and contrary to the forty-fifth rule of court. But even if rightly filed, still the cause stands but upon the pleadings. The sixty-sixth rule of court requires the complainant to file a general replication; that is to say, as that term is defined, "a general denial of the truth of the defendant's plea or answer, and of the sufficiency of the matter alleged in it to bar the plaintiff's suit, and an assertion of the truth and sufficiency of the bill."* The paper filed in this case does not amount to any such denial. It only asserts that "the plaintiffs join issue with defendants, and will hear the cause on bill, answer, and proofs." This is not a mere irregularity in form; it is a failure to put the cause at issue. Moreover it was filed after testimony was taken.

---

* Cooper's Equity Pleading, 329, 330; Mitford's do., by Jeremy, 321, 322; Story's d ., § 878

2. The answers deny all the equity of the bill; and as there was no replication, the bill should have been dismissed as to all parties.

3. But if the proofs be consulted, they do not make such a case as overcomes the answer.

*As to the goods.* The most that can be deduced from the statements of all the witnesses is, that when the sale was made, Nicholson was in failing circumstances; and there may be some evidence conducing to prove that Moore knew it, or might have known it by diligent inquiry. They do not establish any intention to defraud, delay or hinder creditors; but, on the contrary, that the object of Nicholson was to pay his debts, giving a preference to his home creditors. The assets were in fact used for that purpose.

The only tendency of proof in an opposite direction is the statements of Nicholson after the assignment, which are no evidence as against Moore, and cannot overcome Nicholson's own sworn answer.

The facts that Nicholson had creditors, and that his means were insufficient to pay them, and that he apprehended suits, and preferred to pay his home creditors, would not, in themselves, prove the fraudulent intention. The man in debt may sell to pay his debts, and he may prefer creditors.*

The case does not come at all within the principles of *Twyne's Case,*† the leading case on fraudulent conveyance, and which has been followed in Texas.‡ Possession was taken by Moore; the sale was open; and as we have said, there is no proof that Nicholson retained any interest.

*As respects the lots,* the bill was rightly dismissed. The account given by both Nicholson and his wife is so perfectly natural, that being sworn to by both as it is (and by the wife voluntarily, though verification by oath was dispensed with

---

* Baldwin *v.* Peet, 22 Texas, 710–724; S. C. 26th February, 1860; Paschal's Digest, 652; 25th Texas.

† 1 Smith's Leading Cases, 1; reported from 3 Reports, 80.

‡ Bryant *v.* Kelton, 1 Texas, 418–433; Edrington *v.* Rogers, 15 Id. 188; Mosely *v.* Gainer, 10 Id. 393; Mills *v.* Howeth, 19 Id. 259; Humphries *v* Freeman, 22 Id. 50.

by the other side), no reasonable doubt can be had as to its truth. It is a natural, probable, and consistent story, and the slight discrepancies to be found between the narratives of the different parties, and between oral statements and written documents, is the best proof of truth. In an invented story, such things would not be seen any more than a forged will would appear to be informally acknowledged, which Lord Mansfield said such a will never was. The case presents truth under its most convincing aspect; that is to say, it presents substantial truth narrated with circumstantial variety. The substantial truth has already been established by judicial decree in Bastrop County.

*Mr. C. Robinson, contra, for the Creditors:*

1. *As to the goods.* The preliminary objections as to want of leave of court to file the amended bill, and of want of replication, and the effect of such want, are too technical. There was a replication in substance; and if not, the objection comes too late when it comes for the first time here, the complainant never having asked below to have the bill dismissed, *sec. reg.*

We pass to the question of merits. The evidence of fraudulent intent appears strongly by Nicholson's own statements, orally and in writing. His letter of July 18th, 1851, and his "memorandum," are conclusive. Moore's participation in the fraud is proved by Hall. The decree setting it aside was right.*

2. *As to the lots.* It is stated in Nicholson's answer, that Moore purchased the same, "*paying therefor* the sum of $860;" and in Moore's answer, that he purchased the lots for the sum of $860, all of which was "*paid* in like good faith." Yet it is stated by Dunbar, that when he, as an officer, was taking

---

* Briscoe *v.* Bronaugh, 1 Texas 326; Thompson *v.* Shannon, 9 Id. 538; Mosely *v.* Gainer, 10 Id. 393; Walcott *v.* Brander, Id. 424; Edrington *v.* Rogers, &c., 15 Id. 188; Hancock *v.* Horan, Id. 507; Linn *v.* Wright, &c., 18 Id. 317; Mills, &c., *v.* Howeth, 19 Id. 257; Humphries *v.* Freeman, 22 Id. 45; Castro *v.* Illies, Id. 480; Weisiger *v.* Chisholm, &c., Id. 670; Baldwin *v.* Peet, &c., Id. 708; Howerton *v.* Holt, 23 Id. 52; Gibson *v.* Hill, Id. 77; Green *v* Banks, 24 Id. 508.

the acknowledgment of Nicholson and wife to the execution of the deed of conveyance for the lots, Moore, in the presence of Nicholson and wife, went through the form of saying that they were in consideration of debts owing from Nicholson to Moore for property sold and money lent; asking the magistrate to take notice of the fact.

The answers mention an agreement for repurchase of the lots, and a decree as to the title. That decree was entered by consent of parties, and is impeached as fraudulent. The transaction, even as stated by Mrs. Nicholson, was in substance and effect a post-nuptial gift by a husband who was insolvent; the manifest object of the gift being to hinder and defraud his creditors.*

Mr. Justice SWAYNE delivered the opinion of the court.

These are cross-appeals, in equity, from the District Court of the United States for the Western District of Texas.

The appellants, Clements and Sheldon, are judgment creditors of the defendant, James Nicholson, and filed the original and amended bills, found in the record, to set aside, upon the ground of fraud, the sale by Nicholson to the defendant, Moore, of Nicholson's entire stock of merchandise, and the conveyance by Nicholson to Moore, and by Moore to Rebecca H. Nicholson, James Nicholson's wife, of certain lots in the town of Bastrop—described in the proceedings.

The District Court adjudged the sale of the merchandise to be fraudulent and void; and dismissed the bill as to Mrs. Nicholson and the lots.

We are met at the threshold of the investigation by the objections that leave was not given to file the amended bills, and that there is no replication in the case. Hence it is insisted that our examination is to be confined to the original bill and answer, and that we cannot look beyond them. We find in the record a sufficient replication, though it was not filed until after a part of the testimony had been taken. But if there were none, there are two sufficient answers to both

---

* Parish, &c., *v.* Murphree, &c., 13 Howard, 93.

of the objections. They were not made in the court below. They were thereby waived, and cannot be taken here. They are also within the provisions of the statute of 1789, upon the subject of jeofails.*

The goods were sold on the 7th of July, 1851. After satisfying a debt due to House out of the stock, Nicholson determined, under the advice of Larkins, to assign the residue to Moore for the benefit of his creditors. Moore was applied to accordingly. He was told by Nicholson that his object was to secure his creditors, and that unless the assignment was made his entire means would be absorbed by a few of his creditors in New York, to whom he was most largely indebted, to the exclusion of his home and other debts. Moore promised to consider the subject. An assignment was subsequently drawn. Before it was executed Moore made the purchase. The terms were the cost in New York, less 20 per cent. The goods amounted to $6310.35. Moore gave his notes, amounting in the aggregate to that sum. At what times they were payable respectively, and whether they bore interest, does not appear in the case.

The laws of Texas permitted a failing debtor to prefer creditors according to his election.

We find here none of the badges of fraud mentioned in Twyne's case.

The sale was openly made; there was an immediate change of possession; the price agreed to be paid was fully as much as the goods were worth. Moore lost upon them. All the notes given by Moore, except three of $500 each, were applied in payment of Nicholson's debts.

On the other hand, Nicholson was insolvent, and Moore knew it. He knew also that it was Nicholson's purpose to hinder and delay the complainants. It was easy to convert the notes and place the proceeds beyond the reach of his creditors. The same process as to the goods was more difficult. If Nicholson intended a fraud, Moore must have known he was giving him facilities in that direction. One

---

* Brightly's Digest, 41.

of the three notes mentioned was sold by Nicholson at a large discount. The other two were delivered by Mrs. Nicholson to Moore in payment for the lots in controversy.

It remains to consider the law applicable to this state of facts.

The statute of the 13th Elizabeth has been substantially enacted in Texas. The same legal principles apply there in this class of cases as in the other States where similar statutory provisions exist. As was remarked by Lord Mansfield, in *Cadogan* v. *Kennett*,* the common law, without the statute, would have worked out the same results. A sale may be void for bad faith though the buyer pays the full value of the property bought. This is the consequence, where his purpose is to aid the seller in perpetrating a fraud upon his creditors, and where he buys recklessly, with guilty knowledge. When the fact of fraud is established in a suit at law, the buyer loses the property without reference to the amount or application of what he has paid, and he can have no relief either at law or in equity. When the proceeding is in chancery, the jurisdiction exercised is more flexible and tolerant. The equity appealed to—while it scans the transaction with the severest scrutiny—looks at all the facts, and giving to each one its due weight, deals with the subject before it according to its own ideas of right and justice. In some instances it visits the buyer with the same consequences which would have followed in an action at law. In others, it allows a security to stand for the amount advanced upon it. In others, it compels the buyer to account only for the difference between the under price which he paid and the value of the property. In others, although he may have paid the full value, and the property may have passed beyond the reach of the process of the court, it regards him as a trustee, and charges him accordingly. Where he has honestly applied the property to the liabilities of the seller it may hold him excused from further responsibility. The cardinal principle in all such cases is, that the property of the debtor shall not

---

* 2 Cowper, 432.

be diverted from the payment of his debts to the injury of his creditors, by means of the fraud.* In the case before us, we think that Moore should be held liable for the note sold by Nicholson, and the two delivered by his wife to Moore in payment for the lots, amounting in the aggregate to $1500, with interest from the date of the sale. We have not adverted to the letter of Nicholson of the 18th of July, 1853, and the accompanying document, nor to his declarations made after the sale. Besides being in direct conflict with his answers under oath, they are inadmissible against Moore, and can in nowise affect the conclusions as to this branch of the case at which we have arrived.

The real estate in controversy is thus described:

" A block of lots in the town of Bastrop, in said State of Texas, known in the plan of said town as block No. 95 (ninety-five), east of Main Street; fractional lot or block No. 4 (four), east of Main Street, and lots No. 65 (sixty-five), No. 62 (sixty-two), and 70 (seventy) in block 11."

The property was conveyed by Nicholson and wife to Moore by deeds bearing date on the 13th of June, 1853. The considerations expressed amount in the aggregate to $560. The bill and amended bills charge that the deeds to Moore, and the sale by Moore to Mrs. Nicholson, were without consideration, and made to defraud the creditors of Nicholson.

The answer of Moore alleges that he bought the lots in good faith, and paid $860 for them; afterwards.he agreed they might be repurchased for what he gave, with interest at the rate of ten per cent. Except block 95 and fractional lot 4 he sold them to Mrs. Nicholson; she paid him, as he understood, out of her own separate means, and she subsequently procured a decree of the District Court of Bastrop County that he should convey a good title to her, which he

---

* Sands and others *v.* Codwise and others, 4 Johnson, 536 ; Boyd and Suydam *v.* Dunlap and others, 1 Johnson's Chancery, 478; Webb *v.* Brown and others, 3 Ohio State, 246; Sexton *v.* Wheaton, 1 American Lead. Cases, 50, note; Twyne's case, 1 Smith's Leading Cases, 34, notes; Roberts on Fraudulent Conveyances, 520, 527.

was ready to do. He alleges further that block 95 had been sold to pay a debt of Nicholson.

The answer of Nicholson is the same as the answer of Moore, in regard to the sale of the lots to Moore and the subsequent agreement. In regard to the sale to Mrs. Nicholson, he states that when he married her, she had a considerable amount of money belonging to her and to a child by a former husband; he borrowed from her from time to time until the amount exceeded $500; he transferred to her one of the notes of Moore for that amount; she bought the lots from Moore and paid for them with that note and other separate means belonging to her. He makes the same statement as Moore in regard to the decree of the District Court of Bastrop County, and the sale of block 95. He says the premises are in possession of his father under an arrangement with Mrs. Nicholson.

Mrs. Nicholson answers that when she married Nicholson she had about $1000 in money, which she lent to him, taking in lieu two notes of Moore of $500 each; some time afterwards she delivered the notes to Moore in discharge of a mortgage upon the premises, which Nicholson had given to him; that Nicholson has never repaid to her any part of the money which he borrowed; she has realized nothing from the loan but the lots in question; Nicholson is utterly insolvent; she has no hope of getting any other indemnity, and that the value of the lots does not exceed the amount of the loan. She insists upon the good faith of the transaction, and denies that any wrong or fraud was intended upon the complainants or any other creditor of Nicholson.

The complainants waived an answer, under oath, by this defendant. Her answer is nevertheless verified by an affidavit. This was proper. It was her right so to answer, and the complainants could not deprive her of it. Such is the settled rule of equity practice where there is no regulation to the contrary.*

The decree of the District Court of Bastrop County is

---

* Armstrong et al. *v*. Scott et al., 3 Greene, 433

found in the record. It was entered by the agreement of counsel. It required Moore to execute to Mrs. Nicholson a full and complete title to lots 62, 65, and 70. It is silent as to block 95, and ordered lot 4 to be sold to satisfy the claim of Scott, a defendant in that proceeding. Neither party took any testimony touching this part of the case. It stands upon the bills and answers.

No attempt is made to explain the contradiction of the answers of Moore and Nicholson by the deeds as to the amount of the consideration alleged to have been paid by Moore for the lots. The answers of both are silent as to the mode of payment. This rendered disproof of the allegation of the amount difficult, if not impossible. The facts disclosed create a strong doubt of the integrity of the transaction between Moore and Nicholson, and threw on Moore the duty of making a full explanation, and the burden of proof to sustain it.* We feel constrained to resolve the doubt against the validity of the sale. The striking discrepancies between the answers of Mr. and Mrs. Nicholson need no remark. She admits that she paid for the lots by delivering up to Moore notes which he had executed to Nicholson. This makes a *primâ facie* case against her. She adds that the notes were transferred to her by Nicholson in consideration of money she had lent to him. Of this there is no proof. It is an established rule of evidence in equity, that where an answer which is put in issue, admits a fact, and insists upon a distinct fact by way of avoidance, the fact admitted is established, but the fact insisted upon must be proved; otherwise the admission stands as if the fact in avoidance had not been averred.† The application here of this principle is decisive. There is nothing to neutralize the effect of the admitted fact, that the property was paid for with notes which had belonged to Nicholson. There is not the slightest proof of any consideration for the transfer of those notes by

* Piddock v. Brown et al., 3 Peere Williams, 289; Wharton v. May, 5 Vesey, 49.

† Gresley's Evidence, 13; Hart v. Tenyke and others, 2 Johnson's Chancery, 60.

him to her.   The complainants have a right to follow the fund into any property in which it was invested as far as it can be traced.*

The decree of the court below is silent as to lots 4 and 95. There is no competent proof in the record sufficient to exempt them from the claim of the complainants.   If others have acquired paramount rights, it must be shown elsewhere in another proceeding.

The decree as to both branches of the case is, in our judgment, erroneous.   It is therefore reversed.   The case will be remanded to the District Court with instructions to enter a decree

IN CONFORMITY WITH THIS OPINION.

---

* Oliver *v.* Piatt and others, 3 Howard, 401.