### SINGER, BAER & Co. and others *v.* JACOBS and others.

*(Circuit Court, E. D. Arkansas.* April, 1882.)

1. FRAUD—SALE OF GOODS.

Where a debtor sold his entire stock of goods to a purchaser with the intent to defraud his creditors, a full consideration paid by such purchaser will not protect him if he has notice, actual or constructive, that the vendor is selling to hinder and delay his creditors.

2. SAME—NOTICE OF FRAUD.

When the facts and circumstances are such as to put a reasonable man on inquiry, that obligation is not satisfied by an inquiry addressed to the chief actor in the suspected fraud, who has every motive for concealing the truth, when better and reliable sources of information are open to him.

3. SAME—CONSTRUCTIVE NOTICE—AVOIDING SALE.

To avoid a sale made to defraud creditors it is not required that the purchaser should have had actual knowledge of the fraudulent purpose of the vendor. It is sufficient if he had constructive notice.

At Law.

The plaintiffs sued out an attachment against Jacobs, which was levied on a general stock of merchandise found in the possession of Thompson, who filed his interplea claiming to be the owner of the same. The following are the leading facts disclosed by the evidence:

On the first of August, 1880, the defendant Jacobs purchased at St. Louis, largely on credit, a fresh stock of general merchandise, with which he embarked in business as a retail merchant at Hope, in this state. The total amount of the stock when first purchased is not disclosed by the evidence, but it does appear that after selling from it in the ordinary course of business until the eighteenth of October, a period of two and a half months, there remained stock to the value of $5,766, invoiced at cash price. This stock, on the eighteenth of October, Jacobs sold to Thompson, a merchant doing business in the same town, for cash, at the rate of 50 cents on the dollar of the cost price. The sale was consummated and the invoice of the goods taken after night and with closed doors. One or more agents of Jacobs' creditors were in the town at the time, pressing him for payment of overdue bills which he had promised to pay that night or the next morning. While the agents of the creditors were resting on this promise, in the expectation of receiving payment the next morning, Jacobs and Thompson, with their clerks, five in number, were engaged in invoicing the goods, under lock and key, at a late hour of the night. Before the work of invoicing began, Thompson says: "I remarked I wanted no foolishness, and wanted to make a payment, and I paid Jacobs right then $1,000 cash, and paid the balance in cash the next day." The creditors' agents finding the store closed the next morning, called to see Jacobs at his residence when he feigned sickness, and assigned that as a reason why his store was not open.

The original invoices of the goods to Jacobs, which disclosed the terms upon which they were purchased, lay on the counter the night the goods were invoiced to Thompson, and reference was made to some of them by his clerks to ascertain the cost of the goods. Jacobs' general reputation for honesty and fair dealing was bad, and Thompson, who had known him many years, admits he knew him "to be tardy in paying debts, and tricky with his customers."

Previous to purchasing the stock of goods Jacobs had property worth $2,000 or $3,000, which he sold, but he had no other property or means which he could have used in the purchase of the goods, and Thompson knew this. Before Thompson concluded the purchase he employed an auctioneer to sell the goods at auction. Jacobs never paid his creditors any part of the money he received from Thompson, and has not paid any of his debts then existing, which amounted to $2,500 and more.

Thompson testifies that Jacobs told him he was selling because he was indicted for an assault with intent to murder, and wanted money to fee counsel to defend him, and that he found he knew nothing about the dry goods business and wanted to get out of it. The indictment referred to by Jacobs was found a year before he purchased the goods, and this fact was known to Thompson, and he was not tried on it until some months after the sale. He testifies further that before making the purchase he saw his attorney and asked him if he would get into trouble in making the purchase, and was told he would not. And Dr. Baylies, another merchant in the same town, says: "Thompson told me he had an opportunity of buying the Jacobs stock so that he could make some money on it, and asked me the question whether I thought there would be any impropriety in it, and I told him I thought not." He says he "asked Jacobs if he was involved with his creditors in any way," and that "he answered there was no claims against the goods;" that he was "led to believe and did believe Jacobs had paid for the goods;" and in conclusion he says, "I don't remember that Jacobs said he was or was not embarrassed. He assured me the goods were not encumbered." He did not ask to see Jacobs' books or his invoices, and did not look at the latter, though they lay on the counter before him, and made no inquiry of any one other than has been stated.

*U. M. & G. B. Rose, Compton & Battle,* and *Cohen & Cohen,* for plaintiffs.

*W. G. Whipple* and *C. E. Mitchell,* for interpleader.

CALDWELL, D. J. It is not contested that on the part of the defendant Jacobs the sale of the goods was a premeditated and scandalous fraud upon his creditors. The general rules of law applicable to the controversy between the interpleader and the creditors of Jacobs are well settled. To avoid the sale it is not required that the purchaser should have had actual knowledge of the fraudulent purpose of the vendor. It is sufficient if he had constructive notice. The law relating to constructive notice in cases of fraud is well summarized by Mr. Bigelow in his treatise on Fraud, (pages 288-9 :)

"If facts are brought to the knowledge of a party which would put him as a man of common sagacity upon inquiry, he is bound to inquire, and if he neglects to do so he will be chargeable with notice of what he might have learned upon examination. * * *

"If, however, there be no fraudulent turning away from knowledge which the *res gestæ* would suggest to a prudent mind; if mere want of caution, as distinguished from fraudulent or wilful blindness, is all that can be imputed to a purchaser of property,—the doctrine of constructive notice will not apply to him."

An actual agreement or conspiracy between Jacobs and Thompson that the latter would aid the former to defraud his creditors does not have to be shown. It is sufficient to avoid the sale if the facts and circumstances within the knowledge of Thompson are such as fairly to induce the belief that he either knew of the fraudulent purpose of Jacobs, or, having good reason to suspect it, he purposely refused to make inquiry, and remained wilfully ignorant. A full consideration paid in cash will not protect a purchaser who has notice, actual or constructive, that the vendor is selling to hinder and delay his creditors; and the reason is, that, by aiding the debtor to convert his visible and bulky property, which cannot readily be concealed from creditors, into money, which it is easy to put beyond their reach, he knowingly assists the debtor to carry out his fraudulent purpose. *Clements* v. *Moore*, 6 Wall. 299, 311. It is not enough that a vendee is a purchaser for value; he must also be an innocent purchaser. The facts and circumstances within the knowledge of the interpleader were clearly sufficient to put him upon inquiry; and it is equally clear that such inquiry, directed to sources of information easily accessible, and to which any prudent man would have appealed, would have disclosed Jacobs' fraudulent purpose.

Some of the leading facts within the knowledge of the interpleader before he purchased are, that he had known Jacobs for many years, and knew his general reputation for honesty was bad, and that he was not punctual in the payment of his debts; that the value of all the property and means that Jacobs possessed before he purchased the goods, and which could have been used in their purchase, did not exceed one-half of the value of the goods purchased; that it was unusual for country merchants to buy exclusively for cash; that no change had occurred in Jacobs' condition, in any way, between the date of his purchase of the goods and their sale to the interpleader; that the indictment against Jacobs was found months before he purchased the goods, and that the pretence that he must sell his

entire stock at a great sacrifice for cash in hand to enable him to fee counsel to defend him in that case, was obviously false; that he was selling the stock for one-half of its cost in the height of the business season, and less than 90 days after its purchase, and about the time debts contracted in its purchase would be maturing; that the interpleader, though a merchant in the same town, did not contemplate removing the goods to his own store, but expected to make money out of the purchase by selling them at public auction; that the same method of disposing of the goods was open to Jacobs, and there was no reason why he should not resort to it if he owed no debts and was honest; that Jacobs had not advertised in any mode his desire to sell his goods, and that he had probably not disclosed his purpose to do so to any other person. The interpleader knew these facts, and the mind cannot resist the conclusion that if he did not actually know of Jacobs' fraudulent purpose, it was because he was wilfully blind, and fraudulently turned away from evidence of the facts.

It is quite evident the interpleader mistook the law, and supposed an actual lien on the goods was the only impediment to his acquiring a good title at any price for which Jacobs was willing to sell, and that bare knowledge on his part that Jacobs was making the sale to defraud his creditors would not affect him. The statement of the interpleader that he supposed the goods were paid for, is unsupported by any facts upon which to found such belief. It is not perceived why he should exhibit such excessive credulity on this point, and fail to give any effect to facts and circumstances tending so powerfully to establish the opposite conclusion. Such facility of belief, it has been well said, invites fraud and may justly be suspected of being its accomplice.

The law deals with the vendee and his acts upon the presumption that he is a man of ordinary intelligence, and he cannot evade responsibility by affecting to believe that which no man of ordinary intelligence, under the circumstances, would believe. He consulted an attorney, but upon what state of facts is not disclosed. Why consult an attorney if he felt no apprehension? Why was it necessary to consult an attorney before making this purchase more than any other? When locked up in the storehouse, after night, with Jacobs and the clerks, why should he pay $1,000 on the purchase before they had begun to take the invoice if he did not apprehend danger from some sudden action of Jacobs' creditors, whose agents were then in the town, and which fact he probably knew or suspected? If this was not his motive, then he must have been

prompted by an utter want of confidence in Jacobs' veracity and business engagements. Whether the act was induced by one or the other of these motives, it is inconsistent with his present attitude in the case. He began early to fortify himself to support a purchase, out of which he expected to make money, but in making which he realized he was incurring some peril. If the sale and invoice of the goods had taken place in the ordinary manner, and during business hours, the fraud would have been detected and exposed at once by Jacobs' creditors, who were on the ground watching him. He does not say that Jacobs denied owing debts; he seems not to have pressed that point. But if he had done so, and Jacobs had answered, as he doubtless would, that he owed no debts, he could not, on the proof in this case, have sheltered himself behind such an answer.

When the facts and circumstances are such as to put a reasonable man upon inquiry, that obligation is not satisfied by an inquiry addressed to the chief actor in the suspected fraud, who has every motive for concealing the truth, when better and reliable sources of information are open to him. He had access to the original invoices, which disclosed the terms on which Jacobs purchased the goods; and if he had discounted the bills for cash they would, according to mercantile usage, have shown that fact. It is not probable any merchant would purchase and pay for a large stock of goods without having some written evidence of the fact. These reliable sources of information, which lay on the counter before him, the interpleader refused to look upon. He purchased the goods out of the ordinary course of business for less than they were worth; the sale was consummated and invoice made in secret, after night, and in great haste, and under circumstances tending to show an active participation in the fraudulent purpose of Jacobs. But whether he was guilty of active participation in the fraud or not, he certainly "did buy recklessly, with guilty knowledge, or, which is the same thing, with such knowledge as would put a prudent man upon inquiry." *Howe Machine Co.* v. *Claybourn,* 6 FED. REP. 438; *Clements* v. *Moore, supra.*