### HERMAN *v.* McKINNEY *et al.*

*(Circuit Court, D. South Dakota.  October 14, 1891.)*

FRAUDULENT CONVEYANCES—PARTICIPATION OF PURCHASER—EVIDENCE.

A merchant in failing circumstances, being indebted to a bank for $1,200 to $2,000, in consideration thereof, and of $8,000 in cash, executed notes to it for $10,000, and secured them by a chattel mortgage on his stock of goods, which constituted his only known property, and was worth from $15,000 to $17,000, and the next day the bank took possession thereof. On the merchant's part, this transaction was entered into with intent to hinder and delay his creditors, and obtain a favorable compromise. The president of the bank, who knew his insolvent condition, and that his creditors were pressing him, testified that, on inquiring whether the $8,000 should be placed to his credit in the bank, the merchant said he was afraid some of his creditors would attach it, and that for a like reason he objected to receiving a certificate of deposit, and asked for the cash, which was given him. *Held*, that the bank was not a *bona fide* purchaser, and the money realized by it from the sale of the goods was subject to the claims of creditors.

In Equity. Creditors' bill. Submitted on pleadings and proof.
*McMartin & Carland*, for complainant.
*Keith & Bates* and *Winsor & Kittredge*, for defendants.
Before Shiras and Edgerton, JJ.

Shiras, J. The complainant, a judgment creditor of one Mortimer Livingston, brought the present proceeding for the purpose of having declared void two chattel mortgages and an assignment of accounts, executed on the 15th and 16th of September, 1886, for the benefit of the Sioux Falls National Bank, on the ground that the same are void as against creditors. From the undisputed evidence in the case it appeared that in September, 1886, the said Livingston was engaged in the clothing and furnishing business at Sioux Falls; that he was largely indebted to various parties for goods purchased, and to the defendant bank in the sum of from $1,200 to $2,000 for money loaned; that on or about the 17th day of September, 1886, the defendant bank took possession of the stock in trade and bills receivable of said Livingston, claiming the right to do so under two certain chattel mortgages and an assignment of accounts, executed by said Livingston under date of September 15th and 16th; that at this time Livingston was insolvent, and his creditors, or some of them, were pressing him for payment, and that this fact was known to the defendants at the time of the execution of the mortgages. It further clearly appears from the evidence that, in giving the chattel mortgages in question, it was the intent and purpose of Livingston to place his property beyond the reach of his creditors, or at least to so incumber his property as that he would occupy a vantage ground, and be enabled to dictate terms of settlement to his creditors other than the bank. The mortgages were for the sum, in the aggregate, of $10,000, and in the execution thereof it is clear that Livingston intended them to operate as a shield for his protection against his creditors at large. So far as he is concerned, it must be held that these conveyances, including the mortgages and assignment of accounts, were executed with a fraudulent intent and purpose. According to the theory and evidence on behalf of the complainant, including the testimony of Livingston, the latter did not in fact receive from the bank the difference between the sum due for money previously loaned by the bank to him and the face of the notes secured by the mortgages, but in fact received only $500; it being the understanding that the claims due other creditors were to be compromised, and a settlement ultimately had, or, according to one view of it, the money was to be sent to Livingston at Detroit. It is only necessary to say that, if the facts are as testified to by Livingston, then it is clear that the defendants were active participants in the fraudulent transfer of Livingston's property, and the mortgages must be held void as against complainant. According to the theory and evidence on behalf of the defendants, there was paid to Livingston at the time of the delivery of the mortgages the sum of $8,000 in cash, and, including the indebtedness due from Livingston, in all $10,000, or the sum evidenced by the notes described in the mortgages in ques-

tion. If this be the fact, then it cannot be questioned that the bank paid an adequate consideration for the mortgages. Payment, however, of a sufficient or full consideration for a transfer of property by an insolvent debtor does not validate the transfer, if for other reasons it is open to attack by creditors. Thus it is said by the supreme court in *Blennerhassett* v. *Sherman*, 105 U. S. 100–117, that—

"It is not enough, in order to support a settlement against creditors, that it be made for a valuable consideration; it must be also *bona fide*. If it be made with intent to hinder, delay, or defraud them, it is void as against them, although there may be, in the strictest sense, a valuable, or even an adequate, consideration."

It clearly appears from the testimony of the defendant McKinney, who was president of the defendant bank, that when the giving of the mortgages was under discussion, and before the execution thereof, he knew that Livingston was insolvent; that his creditors were pressing him for payment; that the proposed transfers to the bank would cover all the known property of such insolvent debtor, and must, of necessity, act as a shield against other creditors; that the stock of goods proposed to be transferred was estimated to amount to $15,000 to $17,000, exclusive of the book-accounts; and that Livingston proposed to transfer this amount of property to the bank for the sum of $8,000, in addition to the $2,000 already due. McKinney also testifies that, in discussing the mode of payment to be made, he asked Livingston if he would have the amount placed to his credit in the bank, but Livingston said he was afraid some of his creditors might attach it, and thereupon he suggested putting it in the form of a certificate of deposit, but that Livingston finally thought that his creditors might make him trouble, and that he would prefer to have it paid in cash. The language used by the supreme court in *Jones* v. *Simpson*, 116 U. S. 609, 6 Sup. Ct. Rep. 538, is entirely applicable to the case now under consideration. It is therein said that—

"It is unnecessary to set out all the facts which, according to the bill of exceptions, the evidence tended to establish. For the purpose of indicating the grounds upon which the case will be determined, it need only be said that, while there was evidence tending to show the payment by plaintiffs of the fair value of the property, its actual delivery to them at the time of the sale, and their continued possession of it until seized under these attachments, there was also evidence tending to prove that the circumstances attending the transaction were so unusual and suspicious as to suggest to business men of ordinary prudence the purpose of the vendors to hinder or defraud their creditors; and, from all the facts, the jury might reasonably have concluded that the plaintiffs were willing, by purchasing the property, to aid the vendors in defeating any efforts of their creditors, by the ordinary process of the law, to obtain satisfaction of their demands."

The evidence on behalf of the defendants clearly shows that they knew the purpose Livingston had in view in converting his stock of goods into cash at a heavy sacrifice, and placing it where his creditors could not reach it, and therefore it must be held that the defendants were not *bona fide* purchasers; for, as is said by the supreme court in the case

just cited, "and such bad faith may exist where the vendee purchases with knowledge of the fraudulent intent of the vendor, or under such circumstances as would put him on inquiry as to the object for which the vendor sells."

The evidence introduced in the case is very voluminous, and no good purpose would be subserved by going into a discussion of the details thereof. It is sufficient to say that, as already stated, it fully sustains the conclusion that on part of Livingston the transfer of his property to the defendants was made with the fraudulent purpose of hindering and defrauding his creditors, including complainant, and that the defendants took the transfer of the property with knowledge of such fraudulent purpose on part of Livingston, and under such circumstances that they must be held to be participants in such wrongful and fraudulent transaction. It follows, therefore, that complainant is entitled to a decree in his favor, holding that the transfers of Livingston's property to the defendants are void as against creditors.

This being a proceeding in equity, and it appearing that the property conveyed to the defendants has been sold at public sale, and the proceeds thereof have been paid to the defendant bank, the rights of the parties are to be settled by treating the defendant bank as a trustee, holding the money for the benefit of whoever is adjudged to be entitled thereto. *Clements* v. *Moore,* 6 Wall. 299. It appears that there was realized from the sale of the goods covered by the mortgages the sum of $9,384.75, and that the costs of such sale were $138.50, making the net proceeds $9,246.25. It is not made to appear that the defendants, or either of them, have received any sums from the accounts or bills receivable owned by Livingston, nor is there anything shown in the evidence which would justify charging the defendants with any larger sum than that actually realized as the net proceeds of the goods sold. The decree will therefore require the payment into court, within 90 days, of said sum of $9,246.25 by the defendant bank, together with the costs of this proceeding; and, in default thereof, that execution issue against said bank for said sum of $9,246.25, and all costs.

EDGERTON, J. concurs.