ROBERT L. PENNEY, Assignee, v. ANDREW C. HAUGAN.[1]

June 7, 1895.

Nos. 9290—(126).

**Insolvency—Preference.**

*Held*, that the evidence did not justify a finding that certain securities, assigned by an insolvent bank to one of its depositors to secure an existing debt, were not given with a view to give him a preference over its other creditors.

**Same.**

A transfer of property by an insolvent debtor to one of his creditors to secure an existing debt may constitute an unlawful preference, although

[1] Reported in 63 N. W. 728.

the debtor was induced to make the transfer for the purpose of obtaining an extension of credit, in the hope of being thereby enabled to continue his business.

Appeal by plaintiff from an order of the district court for Hennepin county, Hicks, J., denying a motion for a new trial. Reversed.

*Henry J. Gjertsen,* for appellant.

· *A. Ueland, Wm. P. Roberts, Rome G. Brown,* and *D. F. Simpson,* for respondents.

MITCHELL, J. The plaintiff, assignee of the American Exchange Bank under the insolvent law of 1881, brought this action to recover some $17,000 of promissory notes transferred June 24, 1893, by the insolvent bank to the defendant as collateral security for the payment of $12,415 due him as a depositor of the bank. The ground upon which the assignee sought to recover was that the transfer was made for the purpose of giving the defendant an unlawful preference over the other creditors of the bank. The city of Minneapolis intervened, claiming that the money deposited by defendant with the bank belonged to it.

The cause was tried, and by the court submitted to the jury, wholly upon the issues between the plaintiff and defendant, and without any reference to the claim of the intervenor. The court submitted to the jury three questions of fact, to wit: (1) Was the American Exchange Bank insolvent at the time the securities in question were transferred by it to defendant? (2) Were the securities given to the defendant with the intention on the part of the bank to give him a preference over other creditors of the bank? (3) Had defendant reasonable cause to believe that the bank was insolvent at the time he received the securities? The court instructed the jury that, if they answered all three of these questions in the affirmative, they must find a verdict for the plaintiff; otherwise, for the defendant. The jury answered the first and third questions in the affirmative, but answered the second in the negative. Consequently, in accordance with the instructions of the court, they found a general verdict in favor of the defendant. Thereupon the plaintiff made a motion to set aside the verdict, and for a new trial. This appeal is from an order denying that motion.

The plaintiff assigns nearly 70 alleged errors. But inasmuch as

those which relate to the rights of the intervenor (which are not involved) are immaterial, and those which relate exclusively to the first or third special findings (which are in plaintiff's favor) were, at most, error without prejudice, it follows that it is only necessary to consider such assigned errors as might have affected the second special finding, or which go to the sufficiency of the evidence, in view of the other two special findings, to support the general verdict.

To correctly understand the case, it is neccessary briefly to outline the situation of the parties at the time these securities were transferred, and the circumstances under which the transfer was made. The American Exchange Bank was a small institution, with $65,000 capital, and "did its clearing" through the State Bank, with which it kept a large deposit. One Kortgaard was largely interested in the latter bank. On June 23 the State Bank, being insolvent, suspended payment, and closed its doors, owing the American Exchange Bank a deposit of over $38,000. The next morning the defendant went to the American Exchange Bank to draw out his balance of $12,415, and being informed by Nelson, the cashier, either that he was unable to pay it, or that it would be inconvenient to do so, the defendant then demanded collateral security, to which the cashier consented, and turned out to him (defendant's own selection out of the entire discounts of the bank) the notes in controversy, to the amount of $17,000.

At the date of this transaction the assets of the American Exchange Bank were nominally about $176,000, of which (using round numbers) $124,000 were discounts or bills receivable; $3,500, real estate; $2,500, furniture and fixtures; cash on hand and with correspondents in New York and Chicago, less than $7,500; tied up in the insolvent State Bank, over $38,000. Nelson, the cashier, admits that he knew that the $38,000 due from the State Bank was unavailable at the time, and of course the amount that might ultimately be realized on it was uncertain. Of the discounts, or bills receivable, about $92,000 consisted of paper of various corporations, in which Kortgaard was interested, and which Nelson says the bank had discounted mainly on the faith of Kortgaard's indorsement. He also admits that he knew that the failure of the State Bank, in which Kortgaard was so largely interested, had impaired the

value of this paper; that it had no present market value, and could not have been negotiated at the time, and that whether it was ultimately collectible he had no opinion at that time. He also says that the failure of the State Bank made him feel uneasy, although "we had hopes of stumbling along, and that we would pull through." From June 17 to June 23, the cash on hand had run down from over $17,000 to less than $5,000. The bank owed depositors nearly $117,000, of which over $88,000 was due on demand.

It was in this condition of things that Nelson transferred to defendant this $17,000 of collaterals, presumably the best in the bank, and noticeably including none of the Kortgaard paper. The result was that assuming that all the remaining paper held by the bank, except the Kortgaard paper, was available, there remained only about $22,000 available bank assets with which to pay or secure other depositors, whose claims amounted to over $104,000. As might have been expected, the bank remained open only two more business days (June 24 and 25), and failed to open its doors on the morning of Monday, the 27th, and shortly afterwards made an assignment for the benefit of its creditors.

Upon the familiar principle that a man is presumed to intend the natural consequences of his own acts, it is difficult, if not impossible, to conceive that Nelson, a business man and banker, in turning out these collaterals to defendant under these circumstances, did not intend to give him a preference over other creditors, and did not understand that this was the necessary effect of the transaction. Making due allowance for the fact that failing debtors frequently indulge in false hopes, and that Mr. Nelson did not then foresee, to its full extent, as we now see, the utter and hopeless insolvency of his bank, yet, as a man of common sense, he must have known that the bank had not sufficient assets to pay its other creditors, or even to secure them as he had secured the defendant; and, if so, then he must have known that he was giving the defendant a preference.

It is urged that the securities were turned out to defendant upon the understanding that he would not withdraw his balance, and that the object was, not to give him a preference, but to enable the bank "to pull through," and go on in business; and much stress is laid upon the facts that defendant did not draw out his balance,

and that the bank continued open for two days, doing business in the ordinary way, as tending to prove that there was no intent on the part of the bank to give defendant a preference. Neither of these facts is, under the circumstances, of any particular weight. If defendant had demanded payment, he could not have obtained it, except in part; and he could not have obtained even that except by the bank's exhausting every available dollar, either in its vaults, or in the hands of its correspondents, and then immediately closing its doors,—a transaction so palpably in violation of the insolvency law that no man of ordinary intelligence could for a moment suppose it would stand. Giving to this excuse or explanation its utmost weight, all that it amounts to is that the cashier had some hope that by giving defendant a preference the bank might perhaps pull through, and be able to continue in business.

It is undoubtedly good law, as contended for by defendant's counsel, that it is not enough that a preference to defendant has ultimately resulted, but that the transfer must have been made with that intent; also that there may be cases where, notwithstanding the insolvency of the transferror, and notice of that fact on part of the transferee, there is a lack of intent to prefer, or at least where the presumption of such intent may be rebutted. Baumann v. Cunningham, 48 Minn. 292, 51 N. W. 611, is a case of the latter class. But as intent can only be determined from a man's act, and as every man must be presumed to intend the natural consequences of his own acts, it follows that, where the necessary consequence of a conveyance or transfer is to give a preference, the intent must be inferred. Such an intent must always be presumed where an insolvent debtor pays or secures one of his creditors when he has not the means to pay or secure the others, unless, as in Baumann v. Cunningham, supra, peculiar or exceptional facts are proven which rebut that presumption, and take the case out of the general rule. A preference is none the less unlawful because it is given to secure further credit, with the hope of thus being enabled to continue in business. Corliss v. Jewett, 36 Minn. 364, 31 N. W. 362. To hold otherwise would be to permit a debtor, in disregard of the provisions of the insolvency law, to speculate at the expense of his creditors, and take the chances of "stumbling along and pulling through," to use the cashier's language. Upon this question of an

intent to prefer, the rule should be somewhat more strictly applied in the case of traders, and especially of bankers, than in the case of nontraders. To permit an insolvent bank to secure one depositor, when it must have known that it was unable to secure its other depositors, and then sustain the transaction on the excuse here given,—that the object was merely to enable the bank to take the forlorn chance of "pulling through,"—would be, not only against natural equity, but directly in the teeth of both the letter and spirit of the insolvent law.

Our conclusion is that the second special finding (upon which, in view of the other special findings, the general verdict depends) is not justified by the evidence. It is therefore unnecessary to consider the alleged errors occurring during the trial. But we may say, generally, that the trial judge seems to have had a somewhat indefinite, as well as inaccurate, conception of what constitutes an intent to give a preference. Both in his rulings during the trial, and in his charge to the jury, he conveyed the idea that if an insolvent debtor secured an existing creditor for the purpose of obtaining an extension of credit, with the hope of "pulling through," there could be no intent to give a preference. He also seems to have so separated the fact of insolvency from that of an intent to prefer as to practically exclude the former from the consideration of the jury, in determining the existence or nonexistence of the latter, whereas the intent to prefer may be inferred from the fact of insolvency, and the further fact that the natural effect of the transfer was to give a preference. Indeed, ordinarily, this is the only way in which such an intent can be proved.

Order reversed.