STEPHEN MAHONEY v. WILLIAM D. HALE.[1]

December 17, 1896.

Nos. 10,316—(280).

### Insolvency—Preferences—Findings of Fact.

*Held*, in an action brought under the provisions of G. S. 1894, § 4243, to have a transfer and assignment of certain promissory notes made by an insolvent bank to one of its creditors set aside, and to recover possession of such notes, that the findings of fact that the transfer and assignment were made by the bank with a view to giving the creditor an unlawful preference over other creditors upon a pre-existing debt, and that at the time the creditor had reasonable cause to believe the bank insolvent, are supported by the evidence.

### Same—Delivery of Possession.

*Held*, further, that other findings to the effect that by and with the consent of the creditor the notes remained in the actual possession of the bank after the alleged transfer and until the creditor, a corporation, was itself placed in the hands of a receiver; that they were treated and dealt with as the property of the bank while in its custody; that there was no actual delivery of the same to this creditor at the time of the transfer, nothing but a pretense at delivery, and that there was no continued change of possession,— were also supported by the evidence.

### Security for Subsequent Debt.

*Held*, further, that not only was the transfer fraudulent and void as to the pre-existing debt, but that it was invalid as security for a debt subsequently incurred by reason of deposits made in the bank after the transfer.

[1] Reported in 69 N. W. 334.

**Pledge—Delivery of Possession.**

In case of a pledge, the requirement of possession in the pledgee is an inexorable rule of law, adopted to prevent fraud and deception. There must be an actual delivery of the chattels as distinguished from a mere pretense, and the change of possession must be continuing, not formal, but substantial.

Appeal by defendant from an order of the district court for Hennepin county, Belden and Jamison, JJ., denying a motion for a new trial. Affirmed.

*Eugene G. Hay* and *W. E. Hale*, for appellant.

*Brooks & Hendrix*, for respondent.

COLLINS, J. This action is one brought by the assignee of the Irish-American Bank, an insolvent, against the receiver of the American Savings & Loan Association, under the provisions of G. S. 1894, § 4243, to have the assignment and transfer of certain notes given by the Irish-American Bank to the American Savings & Loan Association set aside, and to recover possession of the notes, upon the ground that said transfer was a violation of the law of the state, in that it gave to the said association a preference over other creditors of the bank, and that the same was made by the bank with intent to give such preference, and accepted by the association, the latter having reasonable cause to believe the former insolvent. The case was tried to the court without a jury, and upon findings of fact judgment for the plaintiff was ordered as demanded in the complaint. This appeal is from an order denying defendant's motion for a new trial.

We shall not undertake to give a complete statement of the conditions which existed at and prior to the time when the transaction in question took place, nor shall we discuss the evidence to any great extent. An outline of the situation, and brief references to the testimony, is all that we regard as necessary.

The Irish-American Bank was incorporated in 1888, with a capital of $100,000. It never had a surplus fund, but had accumulated undivided profits amounting to about $15,000 prior to December 9, 1895. On that day the state bank examiner ordered that an assessment of 35 per cent. be made upon the stockholders,—a total assessment of $35,000. This was done, but not to exceed $2,300 was paid in. The bank was then irretrievably insolvent. Its capital

had entirely disappeared, and evidently many of its stockholders had also become insolvent. December 21 its total indebtedness was more than $360,000, and of this upward of $216,000 was due on demand. Taking the most favorable view of the testimony, its assets did not exceed $270,000 in value. Its available cash was but $30,376.89, about two-thirds thereof being cash on deposit in other banks. This condition as to available cash was a noticeable violation of Laws 1895, c. 145, § 18, which requires that at all times a state bank shall have on hand in available funds an amount equal at least to 20 per cent. of all its immediate liabilities. It then had and carried as assets dishonored paper—discounted notes—of the face value of $247,786.92, nearly $100,000 of which had been past due for more than one year. The only persons liable upon over $140,000 of these notes were, upon the trial, shown to be insolvent on the day last mentioned. And this state of affairs had been brought about almost wholly by and because of loans made by the bank to its officers and directors, many of whom were insolvent, loans made to insolvent relations of these officers and directors, and loans made to insolvent corporations of which the officials of the bank and their relatives were officers and directors. Even the managing director of the bank was insolvent, and among its assets were notes executed by himself and by insolvent corporations with which he was officially and prominently connected of a face value of about $12,000. And this same director was the president and managing officer of the Savings & Loan Association, of which defendant, Hale, became the receiver under the provisions of G. S. 1894, c. 76, as will be hereinafter stated.

December 21, 1895, at the close of business hours, the bank was indebted to the association in the sum of $78,749.32 on account of money theretofore deposited, for which the latter held deposit certificates, more than $40,000 thereof being due on demand, the balance on time. For obvious reasons, the bank directors made up their minds that prompt steps would have to be taken, or closed doors were inevitable. Holding a conference, it was resolved to lay the matter before the directors of the association, the bank's heaviest depositor as well as creditor, and after banking hours the directors of both corporations, or a majority of each, met for consultation at the bank. They remained in conference, with about

66 M.—30

one hour's intermission, until midnight, and then separated, no plan of action having been definitely agreed on.

The next day, which was Sunday, they again met at the private apartments of a director of the association, who was also its attorney, and after a long session what was known as the "final proposition" was made, and verbally agreed upon. It was that the association should furnish $35,000, of which $10,000 should be in the nature of a loan to some officer of the bank, who should secure the loan by a mortgage on real estate then owned by the bank, but which was to be conveyed by it to the officer to whom the loan was to be made. And, as needed, the association should deposit the balance, $25,000, in the bank. The latter was to assign to the association, of its notes, $156,000 in value to secure both existing and future indebtedness on account of deposits. The bank directors were each to make a special effort to secure from some source additional or new deposits to the amount of $25,000. This agreement was to be reduced to writing, and submitted to the bank directors at a meeting to be held next day.

On Monday morning the president and managing officer of the association, also the managing director of the bank, went to that institution, and with its cashier picked out of its notes a large number, exceeding in face value $156,000, and took possession, as is claimed, by separating them from other notes, made a list thereof, bound them together by rubber bands, and then at the suggestion, or request, of the president of the bank, placed them in an unused drawer in one of the bank safes, giving permission to the assistant cashier to take out any of the same if the makers wished to pay or renew. Payments were thereafter made, as well as renewals, and the money received was credited upon the books of the bank as payments on its paper, of which fact the president of the association was informed from time to time. The $10,000 was furnished on December 23, as agreed upon, and the real-estate mortgage given a few days afterwards. The agreement entered into verbally on December 22 was approved by resolution of the board of bank directors on the 23d, but it was not reduced to writing and actually executed until December 26. No entries of any kind were made upon the books of either institution in regard to the transfer of these notes, so, as a matter of fact, they were carried by the bank as part of its assets until it was compelled to make an assignment for the benefit

of its creditors, January 15, 1896. Meantime the association had increased its deposits in the sum of $21,290.94.

On January 14 the association had been placed in the hands of a receiver, and on that day its president went to the bank, took the notes from the safe, and at once delivered them to such receiver, the present appellant.

It is not important that the written agreement of date December 23, but actually executed three days later, made by the bank and accepted by the association, be set out in full. It recited the fact that the association had on deposit in the bank the sum before mentioned, and that the bank was desirous of retaining such deposit six months, at least, and also to be continued as a depositary for the association; that the latter was willing to permit its money to remain and to continue to deposit in the bank, provided the bank should assign as collateral security sufficient of its bills receivable to secure the deposit. Then followed a clause whereby, in consideration of the premises and for the purpose of securing the present and the future deposits, the bank sold, assigned, transferred, and set over to the association certain promissory notes, described, it was said, in an attached schedule and of the face value of $156,000. No schedule was in fact attached. Provision was made for the delivery to the bank of maturing notes and the substitution of others of equal value. Then followed a stipulation that, whenever the deposits of the association should be reduced so that they did not exceed $78,000, all of the securities were to be returned and reassigned, provided the bank should "at said time be solvent, continuing its banking business, and in as good financial condition as it is to-day." From this clause it will be seen that if the bank was then insolvent, —as it was,—and so remained,—an inevitable condition under the circumstances,—or if its financial condition became worse, and this was also inevitable, the security was for the present deposits as well as for those thereafter to be made. While this instrument referred to future deposits to be made by the association, there was no agreement by the latter that any such deposit should be made. It was duly executed by the bank, but was not acknowledged. It was not signed by or in behalf of the association, but was accepted in these words and figures: "Accepted Dec. 26th, 1895. American Savings and Loan Ass'n., by" its president.

After this statement, which is nothing but an outline of the many matters which were shown upon the trial, we think it unnecessary, as before intimated, specifically to point out the evidence on which the trial court rested its findings that the notes in question were transferred and assigned by the bank to the association with a view of giving the latter a preference over the other creditors of the bank upon a pre-existing debt, and that at the time the association had reasonable cause to believe the bank insolvent. No other conclusion could have been reached, unless it is to be assumed that the men who acted for and represented these institutions pending these negotiations were blind to facts which were not only ascertainable upon reasonable inquiry, but were as notorious and apparent on December 21 as they were when the bank was compelled to make an assignment. We shall say no more on this branch of the case, except that, on the facts, it is a much stronger case in favor of the findings than that of Penney v. Haugan, 61 Minn. 279, 63 N. W. 728, and that had the findings been in opposition to those made we should have felt it our duty to set them aside as not supported by the evidence.

This leads to the only remaining inquiry. Although the transaction was invalid as to the amount on deposit when the verbal agreement, afterwards reduced to writing, was entered into, can the contract be upheld as valid and effectual security for the sum of $21,-290.94 deposited by the association after the notes were selected by its president and placed in one of the safes in the vault of the bank?

The court below found, in reference to the notes selected as security, that they remained with the bank under and pursuant to an agreement between the parties that the bank might renew any of them at its discretion, and might collect and receive payment from the makers, as if it remained the owner of the notes; and also that it might retain for its own use any moneys collected or paid on account thereof; and, further, that from the time of the execution of the written agreement down to January 14 the notes remained in the actual possession of the bank, and under its control, and were used, handled, and treated by the bank as its absolute property; that during this period of time other notes were substituted in lieu of these selected, some were renewed, partial payments were made, and in some cases they were paid in full, the bank in each case appropriating

the money paid to its own use by and with the consent of the association. We have not undertaken to give the findings on this particular point in full, but merely a synopsis. They are, in effect, that there was no change of possession of these notes until after the association went into the hands of a receiver.

Counsel for appellant assign as error that these findings are not supported by the evidence. We are clearly of the opinion that they were. It is true that on the morning of December 23—three days before the written agreement was executed—the president of the association picked out the notes from among all of those held by the bank. He segregated them from the balance of the paper, and inclosed them in rubber bands, and then placed them in a drawer in the bank safe, and in its vault, where they were accessible at all times to the officers of the bank, and where they could not be reached by any officer of the association without the consent and assistance of an officer of the bank. They were not indorsed, and were treated as the property of the bank as completely as if the transaction by which the association attempted to obtain a lien had never been thought of. The purported delivery to the president of the association was a mere pretext, and the alleged continuous possession by it an exceedingly transparent sham. The possession was that of the bank, and, this being so, the association could not claim that the notes were pledged to it for any purpose whatsoever.

To constitute a pledge, the pledgee must take possession, and to retain it he must retain possession. An actual delivery of property capable of personal possession and a continued change of possession is essential. In case of a pledge, the requirement of possession in the pledgee is an inexorable rule of law adopted to prevent fraud and deception; for, if the debtor remains in possession, the law presumes that those who deal with him do so on the faith of his being the unqualified owner of the goods. Casey v. Cavaroc, 96 U. S. 467. There must not only be an actual delivery, as distinguished from a mere pretense, but the change of possession must be continuing; not formal, but substantial.

In view of these findings, abundantly sustained by the evidence, it is impossible to hold that the notes were pledged as security for future deposits, even if we could ignore the fact that as part of the transaction it was agreed between the directors of the insolvent

bank and those of the association, who had abundant reasons for believing the bank insolvent, that the former should seek out and induce further and other deposits in an institution already unable to meet its obligations, and whose ability to pay was being still further weakened by an attempt to fully secure its largest depositor. See Leqve v. Stoppel, 64 Minn. 74, 66 N. W. 208. The case is wholly different from that of Schlitz Brewing Co. v. Childs, 65 Minn. 409, 68 N. W. 65. Nor can the instrument be regarded as a chattel mortgage upon the notes to secure future deposits, for, conceding, without deciding, that negotiable paper can be subject to mortgage as a chattel, and disregarding all questions of actual fraud and all arising out of the fact that there was no continued change of possession, and that the instrument was not acknowledged or filed, there was no description of the property claimed to be covered by it, no possible way of ascertaining what it was. While it recited that a schedule of the notes was attached as an exhibit, there was no schedule of any kind. Had the instrument been duly acknowledged and properly filed, it would have been ineffectual for any purpose as to the creditors of the bank and as against the assignee in insolvency.

We do not consider the claim made by counsel for respondent that as to creditors who deposited with the bank on and after December 21 the admitted facts in this case contain every element of an estoppel, and because of this the appellant cannot retain a lien for the amount deposited during the same period. It is unnecessary.

Order affirmed.