JACOB LEQVE, Assignee. v. GEORGE STOPPEL and Others.[1]

February 6, 1896.

Nos. 9654—(292).

**Fraudulent Conveyance—Consideration — Prior Oral Agreement to Convey.**

Action by an assignee, under an assignment for the benefit of creditors, to set aside, as having been executed with intent to. defraud creditors, a conveyance by S., one of the insolvent assignors, of certain land to his son F.; also, a conveyance of other real estate by S. to K., and then by K. to O., wife of S.'s son G. The partnership of which S. was a member was in fact insolvent when he executed these conveyances, but did not cease business or make the assignment until about a year and a half afterwards. *Held,* that the evidence justified a finding that the conveyance to F. was executed in performance of an oral agreement between him and his father— made seven years previously—that if he would remain at home for six years after he came of age, and work and assume the charge and management of his father's farm, the father would convey to him the land in question, and that F. received the conveyance in good faith, and without notice of any fraudulent intent on part of his father.

**Same—Conveyance Partly Voluntary—Partial Interference—Father and Son.**

Where a conveyance is partly voluntary, courts will, in favor of creditors, often set it aside, so far as it is without consideration, but let it stand as security for the consideration actually paid. But although, in this case, the contract between the father and son was more favorable to the latter than the former would have made with a stranger, the facts do not make a case for the application of this rule of partial interference, especially as there was no gross disparity between the value of the land conveyed and the value of the services rendered.

[1] Reported in 66 N. W. 208.

### Same—Fraudulent Intent—Knowledge of Insolvency.

The property conveyed by S. to K., and by the latter to O., was subject to a mortgage executed by S. before the conveyances. After the property was conveyed to O., she paid off this mortgage with her own money. *Held* that, while the evidence of a fraudulent intent on the part of K. and O. was not at all clear or strong, yet the suspicious circumstances connected with the transactions were sufficient to justify the finding of the court that the conveyances were made and received with knowledge of the insolvency of S., and to secure the property for the benefit of S. and his family free from the claims of creditors.

### Same—Reimbursement of Grantee for Paying Incumbrances—Security.

But *held*, also, that under the circumstances the conveyances should have been allowed to stand as security to O. for the amount she had expended in the paying off the mortgage.

### Same—Rule Stated.

While the general rule is that, if a transfer is tainted with actual fraud, it will not be allowed to stand for any purpose, either of reimbursement or indemnity, this rule is not inflexible. Courts of equity will look at the facts, giving to each its due weight, and deal with the transaction before it according to its ideas of right and justice. If it appears that the grantor and grantee have combined to commit a meditated, positive fraud, and the evidence is clear, the court will not allow the conveyance to stand for any purpose of reimbursement or indemnity. But where the circumstances are so suspicious that the court does not feel warranted in allowing the conveyance to stand, but the evidence of fraud is by no means clear or conclusive, they will, under some circumstances, allow the conveyance to stand as security for the reimbursement of the grantee, at least for money expended by him for the benefit of the property, as by paying off incumbrances.

### Same—Payment to Grantor—Distinction.

Distinction noted between such a case and one where the money has been paid by the grantee to the fraudulent grantor.

Action in the district court for Olmsted county by Jacob Leqve, as assignee of George Stoppel, Sr., and others, insolvents, to set aside certain conveyances as fraudulent and void as against the creditors of George Stoppel, Sr. The insolvents were the several persons who composed the partnership engaged in the creamery business, which is referred to in the opinion. The case was tried before Buckham, J., whose findings, so far as material, are stated in the opinion. From orders denying motions for a new trial, plaintiff, and also defendants George Stoppel, Sr., and wife, George

Stoppel, Jr., and wife, and Gustav Krueger and wife appealed. Affirmed as to plaintiff. Modified as to defendants.

*Chas. C. Willson*, for plaintiff.

*Geo. W. Granger* and *Brown & Abbott*, for defendants.

MITCHELL, J. This action was brought by the plaintiff, as assignee of George Stoppel, Sr., to set aside, as having been made with intent to hinder and defraud creditors—First, a conveyance of 160 acres of land by said George to his son the defendant Frederick Stoppel; second, a sale by the same to the same of certain personal property, consisting of farm machinery and stock; third, a conveyance by the same to his daughter-in-law the defendant Otelia Stoppel of 13 acres of timber land; fourth, conveyances by the same to defendant Gustav Krueger, and by the latter to the said Otelia, of certain Rochester city property. The court below held all the conveyances and transfers valid, except those of the Rochester city property, both of which it set aside as being fraudulent and void as to the creditors of George Stoppel, Sr. Both parties appealed from orders denying new trials.

As plaintiff did not move for a new trial as to the transfer of the personal property, and as, upon the argument, he abandoned his appeal, as we understood his counsel, as to the 13 acres, these two transfers need not be considered, except so far as they may throw light upon the intention of the parties in making the other transfers, to wit, of the 160 acres of Frederick Stoppel, and of the Rochester property to Krueger, and by him to Otelia, wife of George Stoppel, Jr.

1. We shall first consider the. conveyance of the 160 acres to Frederick Stoppel.

The defendant George Stoppel, Sr., was a well-to-do farmer, who had resided for many years three or four miles from the city of Rochester, on his farm, which consisted of 240 acres, or three 80's; all the buildings being on the middle 80, which was his homestead. His family consisted of his wife and two sons, the defendant George, Jr., and Frederick; the latter being the younger of the two. In 1877 the father, being then over 70 years of age, and desiring to retire from the active management of the farm, and apparently, at the same time, to make a partial division of his property between

his sons, conveyed the farm to his son George, taking back a mortgage for an amount which he presumably considered sufficient to support himself and wife in their old age, and also to provide a proper allowance for his younger son, Frederick. George, Jr., seems, however, to have soon become tired of farming, and desired to move into the city of Rochester and engage in some other business. Thereupon, in 1879, he reconveyed the farm to his father, and moved to the city. At this time Frederick was absent at school, but his father, having the farm again on his hands, brought him home, and set him at work on the farm, at which he continued until he arrived at the age of 21 years. Upon his coming of age, which was in 1885, the question naturally arose as to his future course of life.

Thereupon, as the court finds, "the defendant George Stoppel, Sr., had orally promised and agreed to and with his son, the defendant Frederick, that if he would remain at home for six years after he so became of age, and work on his * * * farm, and assume the charge and responsibility of carrying on the same, he, the said George Stoppel, Sr., would at the expiration of said period convey to him, the said Frederick, one hundred and sixty acres of said farm, other than the homestead; and that, in consideration of such agreement, and relying on the same, the said defendant Frederick continued, for about seven years after he became of age, to reside at home and work on his father's farm, and mainly carry on and manage the same; * * * that on April 25, 1892, in pursuance of said oral agreement, and in consideration of the services so rendered, * * * the defendant George Stoppel, Sr., executed to the defendant Frederick" a deed of the 160 acres of the farm, other than the homestead.

Counsel for plaintiff urges that this finding is not supported by the evidence, his contention being that this alleged oral agreement between the father and son is a mere afterthought; that, at most, there was nothing more than a loose family talk or understanding how the father would divide his property among his family after he was through with it; that this understanding had none of the features of a contract of sale, and did not include the displacement of the father's creditors; and that this general, loose understanding

is now attempted to be used so as to do service in supporting a conveyance made after the father had become insolvent.

These family arrangements should, of course, always be scanned with the severest scrutiny, when the rights of creditors are involved, but we certainly cannot say that the evidence did not justify the finding of the court. The alleged agreement between the father and the son was, under the circumstances, a natural and reasonable one; and the fact of its existence, and that the son remained at home and managed the farm until he was 28 years old, in pursuance of and reliance upon this agreement, finds considerable support in the evidence other than the direct testimony of Frederick and other members of the family. As this agreement, in performance of which the conveyance in question was executed, was made while the father was still perfectly solvent, and years before he contracted any of the debts represented by the receiver, this finding of the court would seem to be almost conclusive of plaintiff's appeal.

The court also finds that Frederick received the conveyance "in good faith, and for the consideration hereinbefore named, and without any intent or purpose on the part of either to hinder, delay, or defraud any of the creditors of said George Stoppel, Sr.," and that he had neither notice nor knowledge of his father's insolvency or inability to pay all his debts. This finding is also assailed as not being justified by the evidence.

It appears that in 1889 George Stoppel, Sr., and several others, formed a partnership for the purpose of establishing and operating a creamery in the city of Rochester, together with a number of outlying "skimming" stations. The capital was to be $2,000, "represented by forty shares of stock, of fifty dollars each," of which Stoppel subscribed for six. The business seems to have been started mainly with borrowed capital, and was conducted by a superintendent or manager. The partners, becoming dissatisfied with their manager, secured his retirement in November, 1890, at which time they had a meeting to determine whether the business should be continued. From the statement presented to them, they found themselves with a plant which had cost about $19,000, and with an indebtedness of about $26,000. The evidence shows that Frederick was present at this meeting, with his father, but it does not ap-

pear that he took any part in the proceedings. The general opinion expressed was to the effect that the loss had been caused by bad management, but that the business would pay under proper management, and the conclusion arrived at was that it should be continued. It was continued, but apparently at a constant loss, until November, 1893, when the partners made a general assignment under the insolvent law of 1881,[2] at which time the business was badly and hopelessly insolvent.

This, it will be observed, was over a year and a half after the conveyance of the land to Frederick. There is no doubt under the evidence that the business was also insolvent in April, 1892, when Frederick got his deed. But aside from his presence at the meeting in November, 1890,—a year and a half before,—there is no evidence that Frederick knew anything about the affairs of the partnership, or had any dealings with it, except delivering milk to it, first for his father, and afterwards for himself. From some things that appear in the evidence, he probably knew that the creamery owed some debts to the defendant bank, but there is no evidence that required a finding that he supposed the business was being run at a loss, or that a failure was likely to occur. He testified that he did not suppose that the debts of the creamery had anything to do with his father's individual property; and, as suggested by the trial court, there is nothing improbable in this, in the case of a man unacquainted with business, especially as the partners themselves always designated their interests in the concern as "shares of stock."

In view of subsequent conveyances by the father to other parties, the evidence is quite persuasive that he had in mind a probable failure of the creamery business, in disposing of his property; but Frederick's knowledge of such intent must be judged of by what had occurred when he got his deed, and at that time his father had not disposed of any of his property. There is nothing unusual or suspicious in Frederick's leasing the homestead 80, and buying his father's farm machinery and stock, soon after he obtained his deed. He had neither stock nor implements nor buildings on his own land. His father would not, at his age, be inclined to resume the management of the homestead 80. It is conclusively established by the evidence that he paid his father full value, in cash, raised by exe-

2 Laws 1881, c. 148.

cuting a mortgage on the 160 acres. There was no secrecy about the transactions. The deed was promptly placed on record, and the milk account at the creamery changed from the name of the father to that of the son. The officers of the defendant bank—much the largest creditor of the partnership—soon acquired actual knowledge of these transfers; and yet this does not seem to have excited their suspicions that anything was wrong, for they continued to extend and renew credits to the partnership for over a year afterwards.

It is also argued that the conveyance of the 160 acres must have been intended in part as a gift from the father to the son, and not a contract of sale, pure and simple; that the father would never have made any such bargain with a stranger. It must be admitted that there is some force in this argument, and it has suggested to our minds the only question about which we have had the least doubt in reference to the conveyance to Frederick, viz. whether the conveyance should not be set aside as being in part a voluntary one, but allowed to stand as security for the value of Frederick's services for the seven years; a thing which courts frequently do where the conveyance is partly voluntary,—at least, where it is only constructively fraudulent on that ground. But, if the agreement was that Frederick should have the land for his services, we do not think that the case is one for the application of any such rule.

It cannot be said that the conveyance was in part voluntary, even if the land was worth more than the services and the father gave his son a better bargain than he would have given to a stranger. Moreover, it is by no means clear that any such disposition of the case would in fact do justice to the son. When, at the age of 21, he was about to decide upon his future course, it is not at all certain that he would have been willing to stay at home, and work his father's farm, merely for ordinary wages. It also appears that there was no gross disparity between the value of the land and the value of the services. The court finds that the land was worth $3,500 at the time the conveyance was executed, but the evidence tends to show that it was worth considerably less seven years before, when the oral agreement was made. The court did not find the value of the services, but the uncontradicted testimony of the witnesses placed it at from $300 to $500 a year. Allowing interest

on each year's services, estimated at the average of the figures given by the witnesses, the total amount would equal the value of the land at the date of the conveyance.

2. It remains to consider the conveyances of the Rochester city property.

This property had formerly belonged to George Stoppel, Jr., who had sold it to his father,—part in 1880, and part in 1883. The court finds (and the evidence supports the finding) that his father was still indebted to him for the whole of the purchase money of this property, and for other moneys, but does not find the amount of such indebtedness. The conveyances of the Rochester property from the son to the father state the purchase price at $4,500. On May 14, 1892 (very soon after the conveyance and transfer by George, Sr., to Frederick), George Stoppel, Sr., conveyed the 13 acres of timber, for $130, to Otelia, wife of George, Jr.; the purchase money being applied on the indebtedness of George, Sr., to George, Jr. On the 25th of the same month, George, Sr., sold and conveyed to defendant Gustav Krueger the Rochester property for $2,000 cash, subject to a mortgage thereon executed by George, Sr., for $4,000, which, by the terms of the deed, Krueger assumed and personally agreed to pay. This deed was recorded on the day of its execution. According to the evidence introduced in behalf of the defendants, George, Sr., immediately paid over the $2,000 received from Krueger to his son George, Jr., to apply on his indebtedness to him.

This disposed of all of the nonexempt property of George, Sr., except his interest in the creamery, which, as we have seen, was a debt, rather than an asset. George, Jr., according to his own testimony and that of his wife, immediately paid over to her the $2,000, to apply on an indebtedness which he owed her for money which she had received from her father, and which her husband had used in his business. It should also have been stated that the evidence for the defendants is that the $1,160 received by George, Sr., from Frederick for the farm machinery and stock was also paid over by the former to George, Jr., to be applied on his indebtedness to the latter.

According to the testimony on behalf of the defendants, Krueger, shortly after (within two or three weeks) his purchase of the Rochester property, becoming dissatisfied with his bargain, because

64 M.—6

George Stoppel, Sr., had made misrepresentations to him as to how the premises were rented, and as to the duty of one of the tenants to make certain repairs, concluded to request George, Sr., to take back the property; having mentioned this to George, Jr., the latter suggested that perhaps his wife would buy the property; George, Jr., having communicated the fact to his wife, the latter went to Krueger, and bought the property from him for the same price he had paid George, Sr., and paid him $2,000; but, not having the money with which to pay the $4,000 mortgage which Krueger had assumed, no conveyance was made until the following December, when, having raised the $4,000, she paid off the mortgage and obtained her deed, but, not then having the money to pay the taxes, she did not record it until the following spring.

The court finds that the conveyances from George Stoppel, Sr., to Krueger, and from the latter to Otelia Stoppel, were both executed with knowledge and notice to all the parties thereto of the insolvency of George, Sr., and that both conveyances were made and received for the purpose of transferring the title through Krueger to Otelia, and in view of the insolvency of George, Sr., and to secure the property for the benefit of himself and family, free from the claims of his creditors, and, as a conclusion of law, held that they were fraudulent and void, and ordered judgment that they be wholly set aside.

Judging merely from the evidence as it appears in the record, we are inclined to think that we should have hesitated to find that Krueger was not a bona fide purchaser without notice of any fraudulent intent on the part of his grantor; and, if he was such a purchaser, he would convey good title to his grantee, Otelia, whatever notice or motive she might have had when making the purchase. But in view of all the circumstances disclosed by the evidence, and suggested by the judge in his memorandum, and recognizing the weight to be given in such cases to suspicious circumstances or earmarks of fraud, of the force of which the trial judge, who saw the witnesses, is in better position to judge than an appellate court, we do not feel justified in setting aside his finding as not justified by the evidence. Our conclusion is that the evidence would have justified either one of three conclusions, to wit: (1) That Krueger was an actual, bona fide purchaser for value; or (2) that the purpose of

George, Sr. (known to all the other parties), was to give a prefer-
ence to his son George, as his individual creditor, over his partner-
ship creditors; or, (3) substantially as found by the court, that his
object was to secure to his son George his share of the property
free from the claims of creditors. It would be only under the last
hypothesis that plaintiff would be entitled to any relief; for, as
the property conveyed was the grantor's individual property, his
individual creditors were entitled to a preference, in the applica-
tion of it to the payment of debts.

The only question is whether the conveyances should have been
wholly set aside, or whether, under the circumstances, they should
be allowed to stand as security for the amount of the $4,000 mort-
gage, which the last grantee, Otelia, has paid. The finding of the
court, and the undisputed evidence, is that the defendant George
Stoppel, Jr., either with his own money or that of his wife, has
paid this mortgage. The trial judge seems to have been of the
opinion that this question could not be determined in this action,
for the reason that the defendants asked for no such relief in their
answer, but stood on the entire validity of these conveyances. In
this view of the law we cannot concur. The whole includes all its
parts, and the plaintiff having asked that the conveyances be wholly
set aside, and all the facts and parties being before the court, it
was competent for it to determine, in accordance with the equities
of the case, whether the whole or only a part of the relief asked for
should be granted.

It is well settled that when a conveyance is not tainted with
actual fraud, but is only constructively fraudulent,—as, for in-
stance, where it is in part voluntary,—it will be allowed to stand
as security for the money advanced by the grantee, or to pay off
incumbrances, or to pay the grantor's debts. But it is generally
laid down in the text-books that, where a transfer is tainted with
actual fraud, it is absolutely void, although founded upon a valu-
able consideration, and that it will not be allowed to stand for any
purpose,—either for reimbursement or indemnity. An examination
of the authorities satisfies us that this is too broad a statement of
the law. We admit that where the grantor and grantee have con-
spired together to commit a meditated, positive fraud, and the evi-
dence of that fact is clear, no court ever has allowed or should al-

low the conveyance to stand for any purpose of reimbursement or indemnity to the grantee, who was particeps criminis. Any other rule would be to offer protection to positive fraud. But it is a matter of common knowledge with courts and lawyers that there are frequently cases where conveyances are set aside on the ground of what, in the legal sense, constitutes an actual fraud, which nevertheless involves no moral turpitude, and where the parties did not actually intend to commit, or suppose that they were committing, a fraud. There are also frequently cases where the circumstances are so suspicious that the court does not feel warranted in allowing the conveyance to stand, but the evidence of fraud is by no means clear or conclusive.

To meet the requirements of justice in all these classes of cases, a more elastic rule should obtain than the mere presence or absence of actual fraud, in its broadest legal sense. And an examination of the adjudged cases shows that the courts have never been inclined to tie themselves down to any such hard and fast rule. The English courts seem to feel themselves at liberty, after looking at all the facts, and giving to each its due weight, to deal with each case according to their own ideas of right and justice. Numerous English cases can be found where the court, while setting aside the conveyance, has decreed that it stand as security for money actually paid by the grantee, even where he appeared to have been a partaker of the fraud, but the proof was not entirely clear. See Herne v. Meeres, 1 Vern. 465; Addison v. Dawson, 2 Vern. 678; Clarkson v. Hanway, 2 P. Wms. 203; How v. Weldon, 2 Ves. Sr. 516.

The best American authorities have frequently announced a similar flexible rule, which left them at liberty to do equity in each particular case according as the facts appeared. In the leading case of Boyd v. Dunlap, 1 Johns. Ch. 478,[3] Chancellor Kent states the law thus: "A court of law can hold no middle course. The entire claim of each party must rest and be determined, at law, on the single point of the validity of the deed; but it is an ordinary case in this court that a deed, though not absolutely void, yet if obtained under inequitable circumstances, should stand only as a security for the sum really due. A deed fraudulent in fact is ab-

[3] At page 482.

solutely void, and is not permitted to stand as a security for any purpose of reimbursement or indemnity; but it is otherwise with a deed obtained under suspicious or inequitable circumstances, or which is only constructively fraudulent." He then quotes with approval what was said in Herne v. Meeres and How v. Weldon, supra (which were both cases involving actual fraud), and adds, "Nothing can be more equitable than this mode of dealing with these conveyances of such indecisive and dubious aspect that they cannot either be entirely suppressed or entirely supported with satisfaction and safety."

In Clements v. Moore, 6 Wall. 299, 312, the court, speaking through Justice Swayne states the law thus (after stating the rule in courts of law): "When the proceeding is in chancery, the jurisdiction exercised is more flexible and tolerant. The equity appealed to— while it scans the transaction with the severest scrutiny—looks at all the facts, and, giving to each one its due weight, deals with the subject before it according to its own ideas of right and justice. In some instances it visits the buyer with the same consequences which would have followed in an action at law. In others it allows a security to stand for the amount advanced upon it. In others it compels the buyer to account only for the difference between the under price which he paid and the value of the property. In others, although he may have paid the full value, and the property may have passed beyond the reach of the process of the court, it regards him as a trustee, and charges him accordingly. Where he has honestly applied the property to the liabilities of the seller, it may hold him excused from further responsibility. The cardinal principle in all such cases is that the property of the debtor shall not be diverted from the payment of his debts, to the injury of his creditors, by means of the fraud."

In the present case the court finds that the value of the property was $5,500. Hence the value of the equity ($1,500) was all there was in it for creditors, if these conveyances had never been made. Consequently, that sum is the utmost amount out of which they could have been defrauded. Had the defendants never paid the mortgage, $1,500 was all the creditors could have gotten out of the property. They could not have enforced Krueger's covenant with George Stoppel, Sr., to pay the mortgage. That was a matter that

concerned only the grantor and the mortgagee. It is not the debt-or's money which has gone to pay the mortgage. Why, then, unless some considerations of public policy are involved, should the cred-itors have the benefit of the payment of the mortgage, and be al-lowed to realize $5,500 out of the property, when $1,500 is all the actual interest they had in it originally. Four thousand dollars seems a severe penalty to impose upon parties for an act which the Penal Code does not recognize even as a misdemeanor.

Another fact should be kept in mind: This is not a case where reimbursement is sought for money paid to the grantor, which he may have used up, or placed beyond the reach of his creditors. That would present a very different case. Here the money went to the benefit of the property, and, if the mortgage had not been paid, the creditors, or those who purchased at a creditors' sale, would have to pay it, in order to save the property. While the transac-tion might have involved actual fraud, in a legal sense, yet the proof of fraud was by no means clear or conclusive. It was, in the lan-guage of Chancellor Kent, one of those "conveyances of such in-decisive and dubious aspect that they cannot either be entirely sup-pressed or entirely supported with satisfaction and safety." Under the circumstances, the case is one for "limited interference"; and while the conveyances should, under the finding of the court, be set aside, they should be allowed to stand as security for the reim-bursement of the defendant Otelia for the $4,000 which she has paid to discharge the mortgage, and when the property is sold she should be reimbursed, for that amount, out of the proceeds. As she has had the rents and profits, she would not be entitled to interest. But she ought not to be allowed to make any profits out of the trans-action. Hence, if the net rents and profits have exceeded the in-terest on the $4,000, the receiver may, at his election, allow her in-terest, and compel her to account for the rents and profits.

On the appeal of the plaintiff, the order appealed from is affirmed. On the appeal of the defendants, the cause is remanded, with in-structions to the court below to modify its conclusions of law, and to take such further proceedings as may be necessary to conform to the opinion of this court.