ADDA MCFARLAND, Appellant, v. C. N. JOHNSTON et al., Appellees.

No. 40452.

APRIL 2, 1935.

Arthur Springer, E. O. Newell and S. W. Livingston, for appellant.

E. R. Hicklin, for appellees.

McCoid, McCoid & McCoid, of counsel, for appellees.

HAMILTON. J.—The fact situation necessary to a correct understanding of the issues involved, and to a solution of the legal questions presented. is as follows: The defendant C. N. Johnston was a Louisa county farmer, who, prior to January, 1926, was president of the Farmers & Merchants State Bank of Columbus Junction, Iowa. He was the owner of a large amount of property, and en-

gaged in farming and stock raising on a large scale. There were five farms in Louisa county, referred to in the record as the "Duncan Farm", consisting of 320 acres, in which he owned a half interest; the "Gilkey Farm", of 280 acres, in which he also owned a half interest, the other half belonging to the defendant F. H. Johnston; there was the "Bottom Farm" of 450 acres; the "Cross Roads Farm" of 450 acres; timber land of 20 acres, and the "Home Farm" of 330 acres. The last four of these farms had previously been owned by C. N. Johnston and a brother, T. A. Johnston. T. A. Johnston had sold his interest to C. N. Johnston, but had retained an option to repurchase the undivided one-third of all of said land for $15,000. His option had not yet expired. C. N. Johnston was also the owner of another farm known as the "Griffith Farm" of 210 acres. The above farms were all incumbered by first mortgages in the total sum of $126,500.

In addition to the Louisa county land, C. N. Johnston owned 368½ acres in Dallas county, Texas, clear of incumbrances. No definite value is shown, but the inference is that it was of little value; also one-half interest in a tract of 397 acres in Minnesota, which the evidence showed had returned no earnings for several years. The Minnesota farm was incumbered for $12,000, and the evidence showed no equity therein. He also owned one-half interest in 160 acres in Colorado, incumbered for $7,500, which the evidence showed was one-half its actual value, and an 80-acre farm in Kansas, worth approximately $2,500. He likewise owned a large number of feeding cattle which were subject to chattel mortgages for the purchase price, the exact amounts of the mortgages or the number of cattle not being shown by the evidence; also various interests in farm stock and machinery on the several farms, the actual value of which or the extent of which was not definitely shown by the evidence, and which was likewise covered by chattel mortgages. In addition to this, he had an interest in an oil lease in Oklahoma which brought a net income of less than $100 per year, and he owned some stock in an oil company of less than $4,000, and a rent note of approximately $3,500.

On March 15, 1926, there were three suits filed against C. N. Johnston by the Farmers & Merchants State Bank of Columbus Junction, Iowa, on promissory notes aggregating $22,500, and on July 22, 1926, another suit was filed by E. A. Baldwin for $1,600. The defendant F. H. Johnston, a brother of C. N. Johnston, is also a

farmer in Louisa county, and prior to August 19, 1926, he was the owner in his own right of five different farms, aggregating twelve to fifteen hundred acres. On August 19, 1926, said F. H. Johnston, who had loaned C. N. Johnston $12,000, prior to that date, to take care of an overdraft in his bank account, after some negotiations with his brother and his attorney, entered into a written agreement whereby he purchased the equities of C. N. Johnston in all of his real estate, except what is known as the Griffith farm of 210 acres, and in consideration therefor canceled his own debt of $12,000 and interest, and assumed and agreed to pay unsecured notes and accounts of C. N. Johnston aggregating $52,364, plus accrued interest, to thirty additional creditors of C. N. Johnston. This transaction did not include the Griffith farm, and did not include the personal property owned by said C. N. Johnston.

The defendant F. H. Johnston testified concerning this transaction that his brother, C. N. Johnston, asked him to come down to the attorney's office at Wapello, Iowa, to see about that transfer. "I didn't know just what the indebtedness was until I got down there. I hesitated quite a little about going into it." When asked if he knew that he was expected to buy any of the land before he went down that day, he said:

"I didn't, I suppose I knew it was in the nature of an agreement. I didn't know what the total indebtedness was. The business I suspect was all fixed up between my brother and the attorney before I entered into it. I didn't know just what was expected until I heard the list read." "I was not crowding Charlie at that time to get him to pay the $12,000.00 he owed me, and I don't know as anyone was crowding him, only he was owing the bank. I think they were crowding him, he thought they were going to crowd him. I knew they had some suits. So far as I know, none of the persons on the list of creditors which I agreed to pay were pressing him. The written agreement at the time of the transfer was made at Hicklin's office. Don't know as there was much conversation leading up to the making of it. I just thought I would step in there and save—I don't remember just the words that was said. He said he thought that was the best thing to do and I signed the contract. I said I wasn't anxious to go into it. I just simply thought it was better for me to go in and take care of the creditors he had listed than to have him go into a receivership. He said he would stay

behind and help work it out- and help pay these creditors. He has helped right along."

On September 16, 1926, another transaction took place between said defendants. There had been a tentative settlement made with L. A. Andrew, as receiver of said Farmers & Merchants State Bank, of C. N. Johnston's indebtedness to said bank for the agreed sum of $20,000, for which the defendant F. H. Johnston executed and delivered his promissory note, and in consideration therefor C. N. Johnston executed a deed of conveyance to him for his equity in the Griffith farm, being all the land he then owned, and also turned over to said F. H. Johnston all his personal property, except household goods, a car, some shares of stock, the exact extent or value of which is not shown by the evidence.

On October 14, 1926, plaintiff and appellant brought suit against C. N. Johnston upon a promissory note, and recovered a judgment on January 18, 1927, for $3,429.68. Prior to the time this judgment was rendered, and subsequent to the time of the filing of her petition, to wit: on November 12, 1926, F. H. Johnston reconveyed to C. N. Johnston the Griffith farm, for the avowed purpose of permitting C. N. Johnston to execute a mortgage to secure a note in the sum of $8,000, given to C. N. Johnston's attorneys, Frank F. Messer and E. R. Hicklin, for whatever fees they might have in the defense of his litigation with the Farmers & Merchants State Bank, the tentative settlement with said bank having failed of consummation, which attorneys' fees were later determined to be of the value of $2,500. F. H. Johnston testified concerning this reconveyance that this was done to enable his brother, C. N. Johnston, to settle with his attorneys and to secure them, so that C. N. Johnston's name would appear on the note and mortgage instead of his. "I wanted him to settle with his own attorney." After the mortgage of $8,000 was put on this tract, C. N. Johnston reconveyed the same to his brother, F. H. Johnston.

On December 21, 1926, L. A. Andrew, as receiver of the Farmers & Merchants State Bank, brought an additional suit against C. N. Johnston for $7,204.61. At the January, 1927, term of the district court of Louisa county, Iowa, a settlement was finally effected of all of the liability of C. N. Johnston to the bank for the sum of $19,500, of which $5,000 was paid in cash by F. H. Johnston, and the balance by notes of F. H. Johnston, secured by a mortgage on real estate. On January 18, 1927, the plaintiff got out an

execution on her judgment, which was returned *nulla bona,* and then instituted this action to set aside the transfers of real estate made by the said C. N. Johnston to his brother, F. H. Johnston, on August 19, 1926, and on September 16, 1926, alleging that said transfers were made with the intention of hindering, delaying, and defrauding the creditors of said C. N. Johnston, including the plaintiff, and further alleging that said deeds were voluntary and without consideration.

It appears that there were two trials of this cause. The first trial at the April term of court was not finished when court adjourned. However, the testimony of the defendant F. H. Johnston was taken and this testimony was read into the record at the second trial. The trial court held in effect that there was no actual fraud in the transfers, and that all the transfers constituted one transaction; that as to the plaintiff and appellant the deeds were voluntary, and that the appellant was entitled to a lien upon the transferred real estate, subject to the debts canceled and assumed by the defendant F. H. Johnston in the transaction, and subject to $2,500 of the $8,000 mortgage on the Griffith farm and the $14,500 mortgage to the bank. From this judgment both parties have appealed. The plaintiff will be referred to as the appellant and the defendants as appellees.

It will thus be seen that the issues involve the following fact questions: (1) Does the evidence show that C. N. Johnston made said transfers with the actual intent to defraud his creditors, including the appellant? (2) Was the defendant F. H. Johnston a party to said actual or intentional fraud, if any? (3) Was the court right in holding that the transactions of August 19, 1926, and September 16, 1926, were parts of one and the same transaction? (4) Did the court have jurisdiction under the pleadings to render the judgment and decree which was rendered in this case by the trial court?

We will endeavor to dispose of the question on pleadings before taking up the other matters involved in this appeal. It is strenuously contended by the appellant that the court had no jurisdiction or power to do something which was not asked for and not raised by the pleadings. In other words, she contends through her counsel that the court erred in going outside of the pleadings and the evidence and granting to the appellees relief which they did not claim, either in their pleadings or proof; that is, the appellant's

contention amounts to this: The court, having found that the deed was voluntary as to appellant, must necessarily have found the transaction was fraudulent, and, if fraudulent as a deed of conveyance, could not hold it valid as in effect a mortgage and protect the grantee in the deed to the extent of the consideration paid by holding the instrument valid to that extent and holding it constructively fraudulent as to the excess and giving the appellant a lien upon said real estate subject to the rights of the grantee under said conveyance. The trouble with appellant's contention is that she does not rightfully interpret the court's holding. The court is not granting relief to the defendants. He is granting relief to the appellant, not in its entirety as asked for, but in part, and it is hornbook law that a court of equity, having acquired jurisdiction of the matter, will retain it for the purpose of doing complete justice in so far as possible. It is the claim of the appellant in her petition that the conveyances are fraudulent in their entirety. The effect of the court's holding is that he finds no proof to sustain the plea of actual fraud, but does find inadequacy in the consideration paid, so much so, that as to the difference between the actual value of the property received and the amount of the consideration paid, the instruments are constructively fraudulent as to creditors, and hence voluntary as to the appellant, as to said difference or excess. If this relief granted were based on the answer of the defendants, there would be some grounds for appellant's contention, as the defendants ask for no affirmative relief except that plaintiff's petition be dismissed.

This same contention was made in the case of Leqve v. Stoppel, 64 Minn. 74, 66 N. W. 208, 211, wherein the supreme court of Minnesota said:

"The trial judge seems to have been of the opinion that this question could not be determined in this action, for the reason that the defendants asked for no such relief in their answer, but stood on the entire validity of these conveyances. In this view of the law we cannot concur. The whole includes all its parts, and the plaintiff having asked that the conveyances be wholly set aside, and all the facts and parties being before the court, it was competent for it to determine, in accordance with the equities of the case, whether the whole or only a part of the relief asked for should be granted."

The appellant in this connection further contends that, because the lower court found that said conveyances were voluntary

in so far as appellant was concerned, he necessarily, in order to reach such conclusion, must have found that there was actual fraud which was participated in by the grantee, else the court could not have found upon any possible theory of law that the conveyances were voluntary as to the appellant. Apparently, appellant has overlooked many of the holdings of our court.

In the case of Cox v. Collis, 109 Iowa 270, at page 275, 80 N. W. 343, 344, we find this language:

"He [the grantor] sold, and she purchased, this real estate, valued according to the lowest estimate at sixteen thousand four hundred dollars, for the actual consideration of five thousand two hundred fifty dollars. This was a grossly inadequate consideration, and although the purchase was made by Mrs. Collis in good faith, and without any fraudulent intent, still, as to the creditors of John, it is a fraud, to the extent that the consideration is inadequate; in other words, as to his creditors, she should pay the reasonable value of the property she purchased. She owes to the creditors of John Collis that difference, as a part of the purchase price, and they are entitled to enforce it as a vendor's lien to the extent of their claim, not exceeding the difference."

The same rule has been applied many times in a court of chancery in this and other jurisdictions, even where the consideration was not grossly inadequate, as in the above case, yet the deed was obtained under inequitable circumstances or the facts surrounding the transaction were such as to arouse suspicion, but were insufficient to prove actual fraud, and the grantor was left insolvent. See the recent case of Williams Savings Bank v. Murphy, 219 Iowa 839, 259 N. W. 467.

This is the rule in most of the jurisdictions in this country and comes down to us from an early English case. In Boyd & Suydan v. Dunlap, 1 Johns. Ch. (N. Y.) 478, Chancellor Kent states the law thus:

"A court of law can hold no middle course. The entire claim of each party must rest and be determined, at law, on the single point of the validity of the deed; but it is an ordinary case in this court, that a deed, though not absolutely void, yet, if obtained under unequitable circumstances, should stand only as a security for the sum really due. * * * A deed, fraudulent in fact, is absolutely void, and is not permitted to stand * * * for any purpose

of reimbursement or indemnity; but it is otherwise with a deed obtained under suspicious or unequitable circumstances, or which is only constructively fraudulent."

Likewise in Clements v. Moore, 6 Wall. 299, 312, 18 L. Ed. 786, Justice Swayne states the rule in the following language:

"When the proceeding is in chancery, the jurisdiction exercised is more flexible and tolerant. The equity appealed to—while it scans the transaction with the severest scrutiny—looks at all the facts, and giving to each one its due weight, deals with the subject before it according to its own ideas of right and justice. In some instances it visits the buyer with the same consequences which would have followed in an action at law. In others, it allows a security to stand for the amount advanced upon it. In others, it compels the buyer to account only for the difference between the under price which he paid and the value of the property. In others, although he may have paid the full value, and the property may have passed beyond the reach of the process of the court, it regards him as a trustee, and charges him accordingly. Where he has honestly applied the property to the liabilities of the seller it may hold him excused from further responsibility. The cardinal principle in all such cases is, that the property of the debtor shall not be diverted from the payment of his debts to the injury of his creditors, by means of the fraud."

We quote the following from an Illinois case:

"The object or doctrine of constructive fraud is to protect some right or interest, which, in equity, ought to be preserved, against the effect of a conveyance which is in other respects valid; and therefore, equity does not avoid the deed altogether, but saves against it the rights of interests which are to be protected." Deke v. Huenkemeier, 260 Ill. 131, 102 N. E. 1059, 48 L. R. A. (N. S.) 512, Ann. Cas. 1914D, 293, note.

See, also, McClelland v. Snouffer, 194 Iowa 1387, 189 N. W. 808, where this principle is quite thoroughly discussed by Justice Weaver; Demarest v. Terhune, 18 N. J. Eq. 532, at page 534; Coley v. Coley, 14 N. J. Eq. 350.

In the case of Malcolm Sav. Bank v. Mehlin, 200 Iowa 970, 205 N. W. 788, the discrepancy between the value of the property and the purchase price paid was held to be so out of proportion

as to render the conveyance constructively fraudulent, and to cast on the defendants the burden of rebutting the presumption by proving that the remaining property of the grantor was sufficient for the payment of his debts, citing Campbell v. Campbell, 129 Iowa 317, 105 N. W. 583, Coldren Land Co. v. Royal, 140 Iowa 381, 118 N. W. 426, Nolan v. Glynn, 180 Iowa 870, 156 N. W. 426, 163 N. W. 469, and in that case the judgment of the lower court, setting aside the conveyance, was modified so as to make the plaintiff's judgment lien subject instead of superior to the lien of the grantee under the deed for the amount which the grantee had paid for the property.

Viewed from this angle, which we think is the correct one, we are at a loss to understand why the appellant is in this court. There is no question under the facts in this case that F. H. Johnston, the grantee, when he took over his brother's property, canceled a personal indebtedness of $12,000 and assumed and agreed to pay, and thereby bound himself personally, an additional indebtedness of his brother of $52,364, plus interest, and that, at the time he obligated himself to pay this vast sum and canceled and delivered his own personal note of $12,000, which appellant concedes, was for money loaned to his brother to pay an overdraft at the bank, there was still remaining, belonging to his brother, C. N. Johnston, what is known as the Griffith farm of 210 acres, and all his personal property. Not only did F. H. Johnston assume and agree to pay this vast amount of indebtedness and cancel his own personal obligation of $12,000, but he thereafter personally obligated himself to pay $19,500 to the Farmers & Merchants State Bank in full settlement of the entire indebtedness which C. N. Johnston owed that institution. It is true, at this time he took a conveyance of the other farm known as the Griffith farm, and also took over all of the personal property of said defendant C. N. Johnston. Concerning this transaction, F. H. Johnston testified:

"After the bank settlement was made, I took it in order to get all the security that I could and I did not think I was getting as much as I should have, and I took the deed later to the Griffith farm. It was after the settlement was made with the bank."

It appears, therefore, that, in so far as this record is concerned, instead of the defendant F. H. Johnston attempting to aid his brother in avoiding his debts and defeating his creditors, he was

doing more than a brother's share in assisting him in liquidating his debts. When he assumed and agreed to pay over $50,000 worth of valid claims against his brother, he was strengthening the position of his brother's creditors by making himself and all of his non-exempt property liable therefor. Not content with that, he goes farther and pays the bank $19,500. It is true, this was not 100 cents on the dollar, but it is not for this court to say that under existing conditions it was not a fair adjustment. We must assume that the receiver, as an officer of the court, acted advisedly under the direction of the court in making the settlement. There is nothing in the record, except the statement of counsel in their argument which has no basis in fact so far as the record is concerned, to show that the equities in this bank settlement were all on the side of the bank. It is a well-known fact, of which this court will take judicial notice, that during the recent financial depression, not only individuals, but banks and other corporations, have been forced to liquidate their debts for much less than the face of the obligations. At any rate, the bank's indebtedness has been paid. The court has granted relief to the appellant and given her a lien upon a vast amount of property, subject to the rights and interests of the defendant F. H. Johnston therein, as to the amount he has canceled, paid, or assumed of his brother's debts, and, in so far as this record is concerned, with the exception of two or three small creditors, the other thirty outstanding creditors of the defendant C. H. Johnston are in a vastly better and more secure position than they were before the transfers were made. Under the evidence, there is ample equity above the amount of consideration paid by F. H. Johnston, and upon which the decision of the lower court grants to the appellant a lien to secure the indebtedness due her, and we think the able trial judge has applied sound and conscientious equitable principles in reaching the conclusion and rendering the decision that was rendered in this case.

In order to protect this appellant, the lower court was compelled to hold that the two transactions were in fact a single transaction. Otherwise the plaintiff must have failed, because there was no proof that the making of the first conveyance left the defendant C. N. Johnston insolvent. We think it is very doubtful whether the evidence warranted the trial court in finding that the transactions were in fact one single transaction, but we have resolved that doubt in favor of the appellant, in order that she may be protected along

with other creditors. No doubt this was the ruling motive in the mind of the trial court, and we are in accord with the conclusion reached by the trial judge and for the same reasons and motives. The ends of justice and equity have thus been meted out, and, without disturbing the vested interests of thirty other creditors, including the grantee, who canceled a $12,000 personal indebtedness and paid out cash, in addition, of several thousands of dollars. We are content with the result reached, it being the most fair, just, and equitable possible under all the circumstances disclosed by this record, and the judgment and decree of the lower court is therefore affirmed.

There was submitted with the case a motion of appellees to strike appellant's reply brief and argument, for the reason that it is simply an amplification of appellant's original argument and is in no sense a reply, and therefore does not conform to the rules of this court. We are inclined to think that appellees are right in this. We have searched in vain through appellant's reply brief and argument for something in the argument proper which is in reply to any of appellees' points raised in their original argument. Under the brief points in the reply, a portion of said brief points could be construed to be in the nature of a reply, but nothing in the argument. We have read the argument, however, and considered it, and appellant has had the benefit of the same, and, in view of the result which has been reached, it would serve no useful purpose to strike the same. The motion to strike is therefore overruled.—Affirmed.

All Justices concur.