The "well-established policy" of this state which forbids the maintenance of actions by one spouse against the other for personal torts arose in Strom v. Strom, 98 Minn. 427,107 N.W. 1047, 6 L.R.A.(N.S.) 191, 116 A.S.R. 387, from a reluctance of this court to hold that our married women's act modified the common-law rule as to personal torts. See 38 Harv. L.Rev. 383. We had previously held that a wife had a remedy for her husband's torts against her property. Gillespie v. Gillespie,64 Minn. 381, 67 N.W. 206. Through subsequent expansion, the prohibition of Strom v. Strom progressed from assault and battery to persistent nagging in Drake v. Drake, 145 Minn. 388,177 N.W. 624, 9 A.L.R. 1064, which the husband sought to enjoin; to negligence of the husband during coverture in Woltman v. Woltman, 153 Minn. 217, 189. N.W. 1022; and to negligence before coverture in Patenaude v. Patenaude,195 Minn. 523, 263 N.W. 546. The foundation for this policy, which was neither mentioned nor intimated in Strom v. Strom, first appeared in Drake v. Drake, which said, in declining to aid the husband, that torts of this nature are so disruptive to "the welfare of the home, the abiding place of domestic love and affection," that relief should be denied on the ground that "if permitted to slumber in the home closet [they] would silently be forgiven or forgotten." 145 Minn. at p. 391,177 N.W. at p. 625, 9 A.L.R. 1064.
Although there is no occasion now to reëxamine the validity of the original rule, yet it might be noticed that Strom v. Strom ignored an earlier statement to the contrary where Mr. Justice Mitchell, in speaking of our married women's act, said its purpose was "to preserve the separate legal existence of a married woman in respect to all her rights of person and property, and, to the extent necessary to the full exercise and protection of these rights, *Page 209 
to give her in her own name all the remedies in the courts which she would have if unmarried." Gillespie v. Gillespie,64 Minn. 81, 383, 67 N.W. 206, 207. Obviously, one of such rights of "person" of a person "unmarried" was the authority to proceed against another for a personal tort, whether intentional or unintentional.
Furthermore, the strict policy which is attributed to Strom v. Strom has not been followed, or deemed controlling, in two more recent decisions where occasion was presented for narrow adherence to this alleged policy. The first, Albrecht v. Potthoff, 192 Minn. 557, 562, 257 N.W. 377, 379,96 A.L.R. 471, did not refuse to allow an administrator to sue a negligent father under the wrongful death statute although the mother, who could not sue the father directly, was the sole beneficiary. There we went on record as not opposed to a wife's receipt of benefits from the tort of her husband, saying:
"In view of the present laws governing the relation of husband and wife, this common law rule should not now be extended to apply to this kind of an action."
In another analogous situation, that common-law rule had been extended by other courts to prevent an action by the wife against the husband's employer for the husband's negligence upon the ground that it would sanction a suit by the wife against the husband. Maine v. James Maine Sons Co.198 Iowa, 1278, 201 N.W. 20, 37 A.L.R. 161; Emerson v. Western S. I. Co. 116 Neb. 180, 216 N.W. 297, 56 A.L.R. 327; Riser v. Riser, 240 Mich. 402, 215 N.W. 290. That question was presented here in Miller v. J. A. Tyrholm Co. Inc. 196 Minn. 438,446, 265 N.W. 324, 328. We did not regard our policy so "strong" that it blinded us to a realistic approach. Recovery by the wife against the employer was allowed. The reason for the rule underlying Strom v. Strom was said to be the common-law "theory that husband and wife were one." It was recognized that this was a fiction, and we said: "To adopt defendant's contentions would be taking a backward *Page 210 
step from the present prevailing trend of the decisions. This we do not choose to do."
Where then is the "strong" policy which arose from a common-law fiction, which has been strictly limited by our decisions, and the rationalization for which was a subsequent introduction into our law? The justification advanced in support of the policy is that it tends to reduce or minimize possibilities for disharmonizing the family unit. Drake v. Drake, supra. We are to believe that actions by one spouse against the other for conversion of property (Gillespie v. Gillespie, 64 Minn. 381, 67 N.W. 206); or separate support or maintenance without divorce (Baier v. Baier, 91 Minn. 165,97 N.W. 671; Robertson v. Robertson, 138 Minn. 290, 164 N.W. 980); or for breach of trust (Rich v. Rich, 12 Minn. 369 [468]; Cisewski v. Cisewski, 129 Minn. 284, 152 N.W. 642); or for partition of the homestead (Grace v. Grace, 96 Minn. 294,104 N.W. 969, 4 L.R.A.[N.S.] 786, 113 A.S.R. 625, 6 Ann. Cas. 952); or, lastly, for accounting for moneys (Muus v. Muus,29 Minn. 115, 12 N.W. 343), are not in the least disruptive of the family. Such inconsistency has led Professor McCurdy to submit that: "In most states [as Minnesota], one spouse may bring all kinds of property actions against the other, and to contend that personal injury cases are generally more acrimonious and disturbing to domestic tranquillity than property cases is to ignore common knowledge to the contrary." McCurdy, "Torts Between Persons in Domestic Relation," 43 Harv. L.Rev. 1030, 1053. This so-called public policy which is to prevent the normal and reasonable application of the Conflict of Laws is even more difficult to understand when it is frankly admitted by the majority that "The suit against him and his insurer by his wife or child who has been injured by the negligent operation of his car would not tend to any disturbance in the family relation." Then what justification exists for advancing a public policy with which the majority of the court disagree, which did not originally arise from legislative declaration but from a common-law fiction, and which this court has departed *Page 211 
from on many instances. In my judgment there is no justification. See Pound, J., dissenting, in Allen v. Allen,246 N.Y. 571, 159 N.E. 656; 50 Harv. L.Rev. 351; 36 Columbia L.Rev. 1158; Nutting, "Suggested Limitations of the Public Policy Doctrine," 19 Minn. L.Rev. 196, 209.
The effect of the majority opinion is to disallow the proper operation of the Conflict of Laws because a judicial rule of this state, which we do not like, has become our "policy." "It may properly be pointed out that differences in law do not necessarily constitute a sufficient basis for a declaration that the rule of the foreign state is contrary to the strong public policy of the forum." 3 Beale, Conflict of Laws, § 612.1, p. 1651; Restatement, Conflict of Laws, § 612, commentb. Yet that is what the majority of the court must mean when they say, "We think there is a strong public policy in this state, as established by our decisions since Strom v. Strom." Because we have a contrary rule, we are thus to deny access to our courts for the enforcement of foreign-created rights. This approach is not only opposed to principle, it is opposed to decision. In Chubbuck v. Holloway, 182 Minn. 225, 228, 230,234 N.W. 314, 315, 868, we were asked to abate a foreign-arising action against the administrator of a deceased tortfeasor because this state did not permit such a survival. We asked: "Is the difference between the Wisconsin statute and our law sufficient for declining jurisdiction?" We answered that question in the negative, insisting: "The public policy of the forum cannot, with any regard for logic or general principles of justice, be violated by the enforcement of a vested right created by the law of a foreign state or by the fact that the law which created it differs in respect to some debatable question of internal policy from the corresponding law of the forum." This view was adhered to in Kertson v. Johnson,185 Minn. 591, 242 N.W. 329, 85 A.L.R. 1.
While there is some public policy, some inarticulate public opinion behind every prohibition of law, the public policy which is operative in this field is of much narrower scope. "There is a *Page 212 
growing conviction that only exceptional circumstances should lead one of the states to refuse to enforce a right acquired in another." Loucks v. Standard Oil Co. 224 N.Y. 99, 113,120 N.E. 198, 202. The different manifestations of public policy in the various states "are of minor nature, and for the most part relate to internal affairs" (Restatement, Conflict of Laws, § 612, comment c) or relate to debatable questions of moral expediency. Mertz v. Mertz, 271 N.Y. 466, 475, 3 N.E.2d 597,108 A.L.R. 1120, 1125. This conception of public policy was given a commendable application by the North Carolina court in Howard v. Howard, 200 N.C. 574, 579, 158 S.E. 101, 103, involving a converse situation to that here involved. There an action by one spouse against another was not allowed by the law of the place of wrong but was allowed by the forum. Plaintiff strenuously urged that since the law of the forum permitted such an action, to deny that action would be a violation of the state's policy. To that contention the North Carolina court replied:
"The only asserted ground of contravention seems to be a difference in the law of the two states. * * * But the fact that the law of two states may differ does not necessarily imply that the law of one state violates the public policy of the other." Nutting, "Suggested Limitations of the Public Policy Doctrine," 19 Minn. L.Rev. 196, 203.
In support of this position, it then quotes from one of our own decisions which has become leading on the question of the "strong public policy" which will justify the forum in not enforcing a foreign-created right. Herrick v. M. St. L. Ry. Co. 31 Minn. 11, 15, 16 N.W. 413, 414, 47 Am. R. 771. In that case Justice Mitchell stated the rule as follows:
"To justify a court in refusing to enforce a right of action which accrued under the law of another state, because against the policy of our laws, it must appear that it is against good morals or natural justice, or that, for some other such reason, the enforcement *Page 213 
of it would be prejudicial to the general interest of our own citizens."
The North Carolina court then concluded that [200 N.C. 580] the public policy limitation should be applied to restricted cases like prohibited marriages, wagers, lotteries, racing, contracts for gaming or the sale of liquor, and others." Restatement, Conflict of Laws, § 612, illustrations 1 and 2. On similar facts the same result was reached in other cases. Miltimore v. Milford Motor Co. 89 N.H. 272, 197 A. 330; Dawson v. Dawson, 224 Ala. 13, 138 So. 414; Gray v. Gray, 87 N.H. 82,174 A. 508, 94 A.L.R. 1404.
The public policy which here denies enforcement of this foreign-created right is neither "public" nor "strong." It arose originally from a common-law fiction and from the timidity of judges to depart therefrom in construing the married women's acts. This antique, probably outmoded, rule has become through judicial obedience a settled public policy of this state. Though we do not like it, yet it must persist. Though it was judicial in origin, it cannot be judicial in termination. Before the rule itself can be changed, doubtless the legislature must act. Cf. Law New York, 1937, c. 669. But for this court to frustrate and thwart a legitimate application of the Conflict of Laws by the resurrection of a common-law fiction as the public policy of the state, a policy so "strong" that access to our courts must be denied, to my mind smacks so strongly of judicial intolerance that I cannot refrain from setting forth my views. "The courts are not free to refuse to enforce a foreign right at the pleasure of the judges, to suit the individual notion of expediency or fairness." Are we "so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home"? Cardozo, J., in Loucks v. Standard Oil Co. 224 N.Y. 99, 111, 120 N.E. 198, 201,202.
The order overruling the demurrer should be affirmed.